Frederick R. GLAESNER, d/b/a European Imported Auto Parts, Appellee,

v.

BECK/ARNLEY CORPORATION, Appellant.

Frederick R. GLAESNER, d/b/a European Imported Auto Parts, Appellant,

v.

BECK/ARNLEY CORPORATION, Appellee.

Nos. 85–1852(L), 85–1853.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1986.

Decided May 8, 1986.

---

W. Bruce Johnson (Battle, Fowler, Jaffin & Kheel, New York City, G. Dana Sinkler, Sinkler, Gibbs & Simon, Charleston, S.C., on brief), for appellant/cross-appellee.

David B. McCormack and Anthony M. Merck (Buist, Moore, Smythe & McGee, Charleston, S.C., on brief), for appellee/cross-appellant.

Before WIDENER, MURNAGHAN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

This case arises from the tensions inherent in the relationship between a national supplier and its local distributor. In 1981, Beck/Arnley Corporation, a supplier of foreign car parts, terminated its distributorship agreement with Frederick R. Glaesner. Glaesner sued Beck/Arnley, alleging wrongful termination of the contract in violation of South Carolina tort law and the South Carolina Unfair Trade Practices Act (SCUTPA). The jury found for Glaesner on both counts, and the trial judge entered

judgment in the amount of $33,736 plus $30,166 in attorneys' fees and costs. That court set aside a $10,000 award of punitive damages and declined a discretionary award of treble damages under the Unfair Trade Practices Act.

■■■ We reverse and direct entry of judgment in favor of Beck/Arnley. A termination is not wrongful if it is in accord with the terms of the contract and not contrary to equity and good conscience. Here Beck/Arnley terminated Glaesner for the most basic of business reasons. Plaintiff has also failed to allege wrongful behavior on the part of Beck/Arnley in anything but speculative terms. Thus Beck/Arnley's conduct violated neither the common law of South Carolina nor its Unfair Trade Practices Act.[1]

## I.

Beck/Arnley supplies parts for imported automobiles to approximately 400 independent distributors. In March, 1980, Beck/Arnley and Glaesner agreed that Glaesner would become a Charleston-area distributor for Beck/Arnley. At the time of the agreement, Glaesner was operating an auto repair shop, and he continued to run that business while acting as a Beck/Arnley distributor.

Glaesner sold $5,000 worth of parts during the first month, but subsequently his sales and orders dropped to a low level and remained there. The distributorship agreement provided that "Either party may cancel or terminate this Agreement at any time, without cause, upon one (1) month advance written notice." In October, 1981, Beck/Arnley notified Glaesner that it was terminating the agreement, effective in thirty days, but that it would continue to sell to him for an additional ninety days.

Although the parties agree on the bare outline of facts recited here, they have quite different perceptions of the reasons for Glaesner's meager sales, and of the motivations underlying the termination. Glaesner's view is that Beck/Arnley sold him unsalable parts. The initial inventory for the parts shop was selected by Beck/Arnley. Glaesner contends that some parts were obsolete while others were for cars that no one in the Charleston area owned. Glaesner advertised on radio and in the newspaper during the first months of his distributorship; he also telephoned repair shops in the area that were potential buyers. At trial Glaesner testified that although Beck/Arnley had told him he could expect to turn over his inventory four times a year, he still had over half of his original inventory. The contract gave Beck/Arnley the option to repurchase its inventory after a termination. Glaesner asked Beck/Arnley to exercise its option to repurchase, but Beck/Arnley refused to do so. Glaesner interprets this refusal as a corroboration of his belief that Beck/Arnley used the distributorship to unload obsolete and otherwise unsalable parts.

As one might expect, Beck/Arnley's version of what transpired is somewhat different. It contends that Glaesner's failure to promote the product and his severely limit-

---

1. Beck/Arnley contends that the district court should have applied New York law since the distributorship contract provides that "[t]his Agreement is to be governed by and construed according to the laws of the State of New York." We believe that the district court was correct in its choice of South Carolina law. Federal courts in the exercise of diversity jurisdiction apply the choice of law rules of the forum state, here South Carolina. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 49 n. 11 (4th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Glaesner has alleged that Beck/Arnley is liable in tort, rather than in contract. Under South Carolina law, a cause of action for tort arises where the injury or wrongdoing occurs. *Mizell v. Eli Lilly & Co.,* 526 F.Supp. 589, 592 n. 2 (D.S.C.1981); *Oshiek v. Oshiek,* 244 S.C. 249, 136 S.E.2d 303, 305 (1964). Since the alleged injuries were sustained in South Carolina, and "the nature of liability … is *ex delicto,* not *ex contractu,*" South Carolina law applies. "No issue of contractual construction, interpretation, or enforceability is raised by this case. The liability alleged is predicated, rather, upon actions separate and distinct from the Dealer Sales Agreement itself." *ITCO v. Michelin,* 722 F.2d at 50 n. 11.

ed investment in the parts business resulted in low sales. Beck/Arnley estimated expenses for the first year would be $41,100, in addition to the cost of the inventory. By Glaesner's calculation, he spent only $15,650, aside from purchases of inventory, during the nineteen months that he was a distributor. Beck/Arnley maintains that it sold Glaesner parts it considered to be "good moving items," selected on the basis of automobile registrations of foreign cars in the area and its own sales records. Glaesner, it contends, offered no suggestions on the initial selection of inventory.

Beck/Arnley had also requested that Glaesner find another location for his parts business because it feared that Glaesner's repair shop competitors would not come into his repair shop to buy parts. Glaesner did not do so. By the end of 1980, Glaesner had stopped advertising, was no longer calling on customers, and had closed the parts department's ledger. For a year before Beck/Arnley terminated the distributorship, Glaesner had had no full-time manager for the parts business. In 1981, Glaesner bought less than $3000 worth of parts from Beck/Arnley. During the year preceding termination, Glaesner was his own best customer; most of the Beck/Arnley products were acquired by the repair shop. Beck/Arnley thus contends that Glaesner was using the distributorship to gain a price advantage over competitors, purchasing directly from the supplier instead of going through a distributor. In the meantime, it became unprofitable for Beck/Arnley to service a distributor with such a minimal sales volume.

In short, Glaesner contends that he was terminated as a part of Beck/Arnley's scheme to rid itself of useless and unsalable parts, while Beck/Arnley argues that Glaesner's poor business practices resulted in such negligible sales that it could not afford to keep him as a distributor. Such divergent versions of the facts and reciprocal casting of blame are common when expectations engendered by business dealings fail to materialize. Mutual recrimination and suspicion may typify times when profits are low and dealings turn sour. Such differing views do not, however, ordinarily give rise to an action in tort or create a jury question as to which party's version of business reality is the right one. Rather, recourse is normally had to the terms of the contract which the parties themselves negotiated and to the business setting in which that contract took form.

## II.

The supplier-distributor relationship is a risky one. J. Hlavacek and T. McCuistion, "Industrial Distributors" in *The Marketing Renaissance* 503 (ed. D. Gumpert 1985). Two parties make a distributorship agreement in the expectation that it will be profitable for both sides. In some cases, however, it will be profitable for neither. The causes of distributor failure are legion: changing economic conditions or market trends; poor product quality or supplier support; inadequate investment or experience on the part of the distributor himself. There has been a tremendous growth in the number of distributorships and franchises in recent years, but "failures and terminations of franchises have grown in equal proportion giving rise to large numbers of disappointed investors." Briley, *Franchise Termination Litigation: A Comparative Analysis*, 16 U.Tol.L.Rev. 891, 891 (1985). In 1983, 2700 independent franchisees were either terminated or failed on their own. *Id.* Beck/Arnley had terminated 44 distributors in the five years preceding Glaesner's suit; at the time of trial, it was supplying approximately 400 more.

The supplier sets up a distributorship because it thinks there are profits to be made. "[O]ne does not take on a distributor in the expectation of having a war, but rather because there is profit in the connection for both parties." T. Bonoma, *The Marketing Edge* 49 (1985). Where there is no profit in the relationship, business analysts suggest that the distributor should be terminated. *See, e.g.,* Hlavacek and McCuistion, *supra,* at 508. A supplier cannot remain in business if it is forbidden to terminate unprofitable distributors. The

more successful distributors may also be penalized if the supplier continues to incur servicing and shipping costs to unprofitable ones. To the extent the chain of distribution incurs such expenses, the cost of products to consumers may also rise.

We recognize, however, that restrictions on terminations have been legislated in order to protect those distributors with comparatively little bargaining power. A national supplier or franchisor is likely to possess greater resources than an individual dealer, distributor, or franchisee. The franchisor can also "force unwanted modifications of the agreements on dealers by threatening to terminate the franchise relationship or by threatening to fail to renew the relationship when the existing contract expired." *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118 (D.Conn.1980). Congress has enacted a number of statutes to redress the inequality of bargaining power between manufacturers and dealers. *See, e.g.*, the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–1225 and the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841. South Carolina also has statutes regulating dealer terminations in certain industries. *See, e.g.*, S.C.Code Ann. §§ 61–9–1010 to 61–9–1050 (1976) (protecting beer distributors), and S.C.Code Ann. §§ 56–15–10 to 56–15–130 (regulating motor vehicle dealerships).

Even in those industries protected by special statutes, however, not every termination is wrongful. *See, e.g., Crown Central Petroleum Corp. v. Waldman*, 515 F.Supp. 477 (M.D.Pa.1981), *aff'd*, 676 F.2d 684 (3d Cir.1982); *Frank Chevrolet Co. v. General Motors Corp.*, 419 F.2d 1054 (6th Cir.1969). To the contrary, a termination of a distributor for business reasons is necessarily a common occurrence. The contract here anticipated just that circumstance and provided both parties the right to terminate. The supplier did no more than exercise its contractual option. Not every distributorship will succeed, and the supplier is not the guarantor of every distributor's success. The acumen and industry of the individual distributor are as often as not the determining factors, the lack

of which no law or contract is likely to remedy.

### III.

The parties point us to no South Carolina statute which addresses the auto parts industry or which would abrogate the operative provisions of this contract in the name of public policy or unequal bargaining power. The plaintiff also alleges no breach of contract on the part of Beck/Arnley. Rather, he argues that the fact of contract termination was a tortious act. South Carolina law on the tort of wrongful termination reflects both the realities and risks of the distributor-supplier relationship. Courts have found wrongful termination only in extraordinary circumstances, none of which are present here.

In the seminal case, *Philadelphia Storage Battery Co. v. Mutual Tire Stores*, 161 S.C. 487, 159 S.E. 825 (1931), the court held that a jobber who had been terminated at the peak of the radio selling season, without notice, had a cause of action for wrongful termination against the seller, Philco. The contract provided for termination at any time by either party, but the court said that the agreement might "not be terminated, if the manner of its termination be against equity and good conscience." 159 S.E. at 826. In *Philadelphia Storage*, Philco's behavior was egregious. The parties had previously had a contract, and on its termination had made a similar agreement. The jobber had spent a great deal of money on advertising, hired a number of agents and bought heavily from Philco. The jobber alleged that Philco had terminated him at the height of the selling season in order to replace him with another jobber. "Analyzed, these allegations mean to charge [Philco] with bad faith and fraudulent conduct." *Philadelphia Storage Battery*, 159 S.E. at 826.

In subsequent cases, a dealer terminated in accordance with the terms of the contract has had a cause of action for wrongful termination only when the supplier acted arbitrarily or in bad faith. *See Gaines*

*W. Harrison & Sons, Inc. v. J.I. Case Co., Inc.*, 180 F.Supp. 243 (E.D.S.C.1960) (After Harrison had been a dealer for Case tractors for many years, Case told Harrison it could not continue to be a dealer unless it agreed to 1) buy a new kind of tractor, 2) not handle any competitive lines, and 3) accept a lower discount rate); *de Treville v. Outboard Marine Corp.*, 439 F.2d 1099 (4th Cir.1971) (de Treville had been a franchised Evinrude dealer for nine years, had invested heavily in Evinrude equipment, replacement and repair parts, and was subject to baseless termination); *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207 (4th Cir.), *cert. denied*, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983) (jury could find Bostick had been terminated because of its role as a rising wholesale competitor of Michelin).

■ Given the limited circumstances in which courts have allowed a cause of action for wrongful termination, we cannot say that Beck/Arnley's termination of Glaesner was wrongful as a matter of South Carolina law. The terms of Glaesner's distributorship agreement provided that either party could terminate the agreement at any time, without cause, by giving one month advance written notice. Beck/Arnley gave Glaesner the prescribed notice and then offered to sell to Glaesner for an additional ninety days in order to give Glaesner an opportunity to find new suppliers.

Glaesner's principal allegation is that Beck/Arnley selected inventory it knew Glaesner could not sell, terminated Glaesner, and refused to buy back the parts. In order to find wrongful termination under this theory, the jury would have had to decide that Beck/Arnley acted willfully and maliciously. However, the district judge acknowledged that Beck/Arnley had *not* acted willfully when he refused treble damages and granted Beck/Arnley a judgment notwithstanding the verdict on punitive damages. *See* S.C.Code Ann. § 39–5–140 (1976) (treble damages shall be awarded if the court finds the unfair practice a knowing or willful violation). When it struck the jury's award of punitive damages, the court could not have been more candid: "I think [Beck/Arnley's] conduct was not willful or wanton or [in] total and reckless disregard for the rights of the plaintiff."

In order to inflict "needless injury" or to act "contrary to equity and good conscience," *de Treville*, 439 F.2d at 1100, the supplier must have acted maliciously and without reasonable business justification for ending its relationship with the distributor. Glaesner has failed to produce evidence sufficient to permit a jury to find that Beck/Arnley acted in this fashion. There was no evidence, for example, that the parts were different from parts routinely distributed to other dealerships, or that they were damaged, or that they had been rejected by another buyer, in short, no circumstantial evidence of the sort that would permit the jury to infer wrongdoing. There is also a complete absence of any direct evidence that Beck/Arnley deliberately plotted to saddle Glaesner with parts it knew he could not sell. Without such evidence, Glaesner's charges are too speculative for submission to a jury. *See* 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2524 (1971).

Beck/Arnley, moreover, had easily comprehensible business reasons for terminating Glaesner, and, though it was not Glaesner's exclusive supplier, it carried out the termination in a manner calculated to provide Glaesner with ample opportunity to adjust. Glaesner ordered only $3000 worth of parts in 1981, before he was terminated in October of that year. In 1981, Glaesner did not advertise the parts business, nor did he have a parts manager. In fact, Glaesner's repair shop was the best customer of Glaesner's parts shop. At trial the Vice President of Sales for Beck/Arnley testified that distributor purchases per year range from $24,000 to $1,500,000. In his year of termination, Glaesner showed scant promise of coming close to the bottom of this range.

■ Nor was Beck/Arnley obligated to repurchase its inventory from Glaesner, although the agreement gave it the option to do so. Glaesner alleges that

**390**

Beck/Arnley's failure to buy back the inventory was part of its scheme to unload unsalable parts. At trial, the testimony demonstrated that Beck/Arnley does not buy back inventory unless the distributor still owes it money. In that case, the option to repurchase affords Beck/Arnley a chance to recoup its losses. Beck/Arnley did not know if the parts in Glaesner's stock remained in top shape, and its policy on repurchases is seemingly calculated to give distributors some market incentive to sell the maximum number of parts themselves. This customary exercise of its contractual option not to repurchase was neither arbitrary nor an act of bad faith.

Beck/Arnley makes money only if its distributors sell parts. It had no plausible incentive to give its distributors unsalable parts or to conspire to make its own distributors collapse. In the world of distributorships, the expectation is that distributors who perform poorly will be replaced. Hlavacek and McCuistion, *supra*, at 511. Glaesner's efforts to promote Beck/Arnley parts and his own business had steadily decreased. Beck/Arnley was not obliged by statute, by common law, or by contract to stand mute in the face of such a development. While supplier behavior that is arguably arbitrary or malicious would present a question for the jury, South Carolina law has never equated the exercise of reasonable business judgment with an act of tortious bad faith.

### IV.

Glaesner has also alleged that Beck/Arnley violated the SCUTPA, S.C.Code Ann. §§ 39–5–10 to 39–5–140, by terminating the distributorship.[2] It is unclear whether wrongful termination alone will support a SCUTPA claim. Ordinarily, violations of SCUTPA are either antitrust or consumer actions. *See* Day, *The South Carolina Unfair Trade Practices Act: Sleeping Giant or Illusive Panacea*, 33 S.C.L.Rev. 479, 483 (1982). Here we note no antitrust allegations, no allegations of anticompeti-

tive conduct, and no allegations of consumer injury. Whether a claim would lie in the absence of such allegations is something we need not address, because Glaesner suffered no wrongful termination. An unfair trade practice claim based on the alleged wrongful termination must therefore fail.

The decision of the district court is reversed and the case is remanded for entry of judgment in favor of defendant.

REVERSED.

---

**2.** "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C.Code Ann. § 39–5–20.