Loren D. MILLER, Plaintiff,

v.

W.H. BRISTOW, INC. and W.H. Bristow, Jr., Defendants.

Civ. A. No. 4:89–2668–15.

United States District Court,
D. South Carolina,
Florence Division.

May 31, 1990.

## ORDER

HAMILTON, District Judge.

### I. *Introduction*

Plaintiff, Loren D. Miller, sells motor fuels and groceries at a retail service station in Darlington County, South Carolina. The property is owned by Ruth Borders and was leased to Bekms Corporation on February 1, 1983. Bekms assigned the lease to defendant W.H. Bristow, Inc. (Bristow)[1], who then subleased the property to plaintiff. Bristow is a petroleum marketer who uses a variety of methods to sell fuel to the public. The method employed with respect to Miller is called a "retail consignment basis," under which Bristow places gasoline and diesel fuel (hereinafter referred to collectively as "fuel") at the location on consignment.

The parties signed two contracts: A "Lease" for the real property (hereinafter "Sublease") and an "Agreement for the Supply of Personnel" (hereinafter "Agreement"), both dated July 28, 1983. Paragraph 3 of the Sublease provided for a term of one year, "and continuing thereafter from month to month until terminated, provided, however, either party shall have the right ... to cancel and terminate this agreement at any time during the initial or any renewal term by giving written notice of intent to cancel and terminate at least 30 days prior to the effective date of such cancellation and termination." The Agreement also includes a thirty day notice of cancellation provision. *See* Agreement, para. 14. In addition, the Agreement contains the following terms defining the parties' relationship:

1) Miller would receive a monthly commission of five cents per gallon[2] or $200 per month, whichever is greater (para. 4);

2) Bristow would retain title to the products delivered (paras. 5, 11);

3) Bristow would bear the risk of loss of all consignment fuel, except that result-

S. Jahue Moore, Kirkland, Taylor, Wilson, Moore, Allen & Deneen, P.A., West Columbia, S.C., for plaintiff.

E.S. Swearingen, Swearingen & Luther, Florence, S.C., Robert S. Bassman, Alphonse M. Alfano, Roy F. Dunshee, Bassman, Mitchell & Alfano, Chtd., Washington, D.C., for defendants.

---

1. Defendant W.H. Bristow, Jr. is the chief executive officer of W.H. Bristow, Inc.

2. The agreement actually provides for a payment of three cents per gallon, but was apparently orally modified subsequently to provide for a commission of five cents per gallon.

ing from Miller's negligent or criminal conduct (para. 11);

4) Bristow would be responsible for all ad valorem taxes on the fuel, as well as "all privilege and use taxes imposed for the ownership and operation" of the facility (para. 17);

5) Bristow would set the price of all fuel sold on the premises (para. 5).

In July and August, 1989, Bristow and Borders apparently had a dispute over the condition of the roof, each taking the position that the other was legally obligated to repair it. As a result, Borders canceled the lease, followed by Bristow's cancellation of the Sublease with Miller as well as the Agreement. Plaintiff does not dispute that Bristow's cancellation gave the 30 days' notice required by the Sublease and Agreement. Interestingly, Miller then entered into a lease directly with Borders, which was followed by Bristow's reinstatement of the Agreement.[3]

Miller has brought this suit alleging four causes of action. In his first cause of action, plaintiff invokes the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*, (PMPA) to argue that Bristow did not give the statutorily required 90 days' notice of termination, and that Bristow's termination of the Sublease and Agreement did not occur for one of the narrow reasons allowed by the statute. In his second cause of action, Miller claims that Bristow negligently and recklessly failed to keep the Borders/Bekms lease in existence, and in his third cause of action Miller alleges breach of contract as a third party beneficiary of the Borders/Bekms lease. Finally, in his fourth cause of action, Miller has alleged a violation of "federal and state antitrust laws." Because the court has determined that there are no triable issues

of fact and that the applicable law supports defendants' position on each of the causes of action, defendants' motion for summary judgment is granted. Rule 56, Fed.R.Civ. Proc.

## II. *Petroleum Marketing Practices Act*

Defendants contend that the PMPA does not apply to the parties' relationship, arguing that neither the technical definitions in the statute nor its underlying purposes support its application here. Plaintiff has responded by arguing that the arrangement between the parties was specifically intended to circumvent the protection offered by the PMPA and should not be allowed to do so. In examining the arguments of the parties, it is necessary first to analyze closely several definitions in the statute.

Congress intended the PMPA to apply only to a franchise relationship between a "refiner," "distributor," and "retailer" of motor fuels under a brand name. The statute defines "franchise" as any contract:

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

15 U.S.C. § 2801(1)(A).

The statute goes on to state that the term franchise includes

---

**3.** Because the status quo of the parties has apparently not changed, at least as a practical matter, this court notes in passing that the PMPA claim may not present a justiciable case or controversy. Bristow continued supplying fuel uninterrupted, and there was no change in the parties' relationship. Deposition of Miller, p. 14. Asked to address this issue at the hearing on May 25, 1990, plaintiff's position was that the case or controversy requirement was met because the present arrangement between Miller,

Borders, and Bristow does not offer the PMPA protection that plaintiff claims the previous relationship provided. Defendants' position stated at the hearing was that the request for injunctive relief made pursuant to the PMPA does not present a case or controversy. As for the claim for damages under the PMPA, defendants agreed with plaintiff that the case or controversy requirement was met, but argued that plaintiff could not prove any damages.

(i) any contract under which a *retailer* or *distributor* (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner.

15 U.S.C. § 2801(1)(B) (emphasis added). "Distributor" is defined as follows:

any person, including any affiliate of such person, who—

(A) purchases motor fuel for sale, consignment, or distribution to another, or;

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for such supplier.

15 U.S.C. § 2801(6). "Retailer" is defined as "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7).

Defendants argue that because they retain title to the fuel in the consignment arrangement, Miller is neither a retailer nor a distributor. Defendants cite an Eleventh Circuit case as presenting "virtually identical" facts, and argue that its reasoning should be applied to this case. In *Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335 (11th Cir.1985), *cert. denied*, 474 U.S. 1039, 106 S.Ct. 609, 88 L.Ed.2d 586 (1985), the court concluded that the plaintiff was not a retailer or distributor, and therefore did not receive the protection of the PMPA. The court first examined the contractual relationship between the parties and noted that Texaco owned the land, fuel dispensing equipment, and convenience store on the premises. Texaco assumed responsibility for structural maintenance, retained title to the gasoline products, and paid Farm Stores a fixed hourly rate for the station's operation. In addition to this hourly rate, Farm Stores was allowed to keep all proceeds from the food and carwash sales. Farm Stores agreed to perform routine maintenance, hire employees, and collect money from customers purchasing gasoline.

The court first considered whether, under these circumstances, Farm Stores could be considered a "retailer" for purposes of the PMPA. The court recognized that the definition of "retailer" requires that person to *purchase* fuel, and that Farm Stores had not purchased the fuel, but had instead been paid an hourly rate. The court noted that Farm Stores did *not*:

(i) pay for the gasoline inventory until it was sold; (ii) take title; (iii) pay ad valorem taxes on the gasoline inventory; (iv) bear the risk of loss of the gasoline (except for its own carelessness); (v) retain any funds from the sale of the gasoline to motorists; (vi) set the price or assume the market risk in fluctuations in gasoline prices; (vii) pay sales taxes or extend credit to motorists on resale; and (viii) hold a gasoline retailers business license.

*Id.* at 1340. The court concluded by stating: "It seems obvious to us that the consumer is the purchaser of gasoline." *Id.*

The court then examined whether Farm Stores could be considered a "distributor" as that term is defined in 15 U.S.C. § 2801(6)(B). The court concluded: "We cannot see that Farm Stores can be characterized as a distributor because the public purchases motor fuel at this location for consumption and the distributor definition involves consignment which applies only to wholesale operations." *Id.* at 1341. The court agreed with a prior district court, which had concluded that "[t]he legislative history makes clear that in defining a "distributor" who operates under a consignment Congress had in mind an independent middleman acting as a jobber, not a dealer selling to the public at retail." *Id.* (quoting *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195 (S.D.N.Y.1982)).

■ The rationale of the *Farm Stores* court's discussion of the definition of "retailer" applies equally well in the present case, since plaintiff cannot be said to have "purchased" gasoline from defendants. Plaintiff has attempted to create an issue of fact by arguing in response to this motion that the invoices show that defendants did, in fact, sell gasoline to plaintiff. A printed invoice cannot change the parties' relationship, however, where the Agreement clearly states that Bristow retains title to the product until it is sold to the customer. *See* Agreement, para. 5. Miller agreed in his deposition that title to the fuel passed from Bristow to the customer. Deposition of Loren Miller, pp. 19–20. As a matter of fact, Miller stated in his deposition that he did not *want* Bristow to sell him the gasoline because he "didn't want to be involved that much depth in it as far as that goes." *Id.* at 12. Bristow explained in his deposition that the invoice was nothing more than the form used in all similar transactions regardless of the contractual relationship between the parties. Deposition of Bristow, pp. 32–34. The evidence bears out that the invoices were nothing more than delivery tickets.

Although the standard invoice does include the phrase "Sold To," the manner in which the invoices were used completely refutes plaintiff's argument. The invoices for the delivery of kerosene, which was *sold* to plaintiff, include a dollar figure in the "Amount" column as well as initials in the blank beside "Payment Received." The invoices for gasoline and diesel fuel, which according to the Agreement were placed at the station on consignment, do not include any such information in the "Amount" or "Payment Received" blanks. The Agreement, the depositions, and the invoices themselves establish beyond any doubt that title to the fuel remained in Bristow.

Most of the factors considered by the *Farm Stores* court are present here:

1) Bristow retained title to the gasoline until the customer pumped it into his vehicle;

2) Bristow paid all taxes on the fuel and the property;

3) Bristow set the price for the fuel and made all business decisions relating to the sale of the fuel;

4) Bristow owned and maintained the fuel dispensing equipment;

5) Bristow assumed the entrepreneurial risk.[4]

It is clear, therefore, that here, as in *Farm Stores*, the plaintiff did not "purchase" fuel products from the defendant, and cannot be said to be a retailer as that term is defined in the PMPA. *See generally* Annotation, *Who is "Distributor" or "Retailer" Within Meaning of § 101(6), (7) of Petroleum Marketing Practices Act (15 USCS § 2801(6), (7)),* 80 A.L.R.Fed. 871 (1986).

■ That leaves the question of whether plaintiff can be considered a "distributor" as that term is used in the PMPA. Because plaintiff has not "purchased" the gasoline, he cannot fit within the definition of "distributor" in 15 U.S.C. § 2801(6)(A). The act also defines "distributor" as a person who "receives motor fuel on consignment or distribution to his own motor fuel accounts or to the accounts of his supplier, but shall not include a person who is an employee of, or merely serves a common carrier providing transportation service for such supplier." 15 U.S.C. § 2801(6)(B). It is necessary, therefore, to consider whether plaintiff falls within this second definition of "distributor."

Bristow argues that plaintiff cannot be considered a "distributor" because that term is limited to middlemen, as opposed to dealers selling to the public at retail. All

---

**4.** This court recognizes that the distribution of risk in the present case is somewhat different than that in *Farm Stores.* In *Farm Stores*, plaintiff's financial interest was not related in any way to the amount of gasoline sold; the arrangement was strictly for payment according to an hourly rate. In the present case, plaintiff is paid the greater of a commission of five cents per gallon or $200 per month. This court does not see that the additional five cent commission option distinguishes this case from *Farm Stores* on this point. Plaintiff's only "risk" is that his monthly income from fuel sales will fall to the $200 floor set by the contract. The real entrepreneurial risk is nevertheless assumed by Bristow.

of the courts that have addressed this question have, after examining the legislative history, come to the conclusion urged by Bristow. In *Farm Stores*, the court concluded that "the distributor definition involves consignment which applies only to wholesale operations." 763 F.2d at 1341. At least three district courts have addressed the issue as well and concluded that a person selling to the public at retail cannot be considered a "distributor." In *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195 (S.D.N.Y.1982), the court stated: "The legislative history makes clear that in defining a 'distributor' who operates under a consignment Congress had in mind an independent middleman acting as a jobber, not a dealer selling to the public at retail." *Id.* at 198. In *Automatic Comfort Corp. v. D & R Service, Inc.*, 620 F.Supp. 1349 (D.Conn.1985), the court explained:

> Defendant is not a distributor. Though it receives gasoline in a narrow sense of the word, as the custodian while the gasoline is stored for retail sale at the station, it does not sell gasoline to its own accounts.... The contemplation of Congress was that a distributor was a middle man, a jobber, not an alter ego to a retailer.

*Id.* at 1354.

And finally, in *Sigmon v. Widenhouse Service, Inc.*, 638 F.Supp. 808 (M.D.N.C. 1986), the court noted that the plaintiff would not fall within the definition of distributor, because "[a]lthough gasoline may have been consigned to them it was consigned for sale to the consuming public not to plaintiffs' own motor fuel accounts or to accounts of their supplier. Plaintiffs were not independent middlemen acting as a jobber. Plaintiffs also did not purchase the gasoline within the meaning of the statute." *Id.* at 810. Because the courts are in agreement that Congress intended to include within the definition of "distributor" only a middleman and not one who sells products to the public at retail, Miller cannot be considered a distributor.[5]

Whether a person is a "retailer" or "distributor" entitled to PMPA protection is a question of law for the court. *Farm Stores*, 763 F.2d at 1342. Because this court has determined that plaintiff is neither a "retailer" nor a "distributor" as those terms are defined in the PMPA, he is not entitled to the protection afforded by that act. For that reason, defendants' motion for summary judgment as to plaintiff's first cause action alleging a violation of the PMPA is hereby granted. Rule 56, Fed.R. Civ.Proc.

### III. *Negligence*

■ Plaintiff, in his second cause of action, alleges that defendants acted negligently and recklessly in failing to keep the lease with Borders in existence. It is not clear from the complaint exactly what plaintiff intends to allege in this cause of action. Defendants have responded by arguing that they owe no legal duty independent of the contract, and that plaintiff has not shown any act of defendants that could be considered a breach of any duty owed plaintiff.

It is the law in South Carolina that an alleged breach, or even negligent breach, of a contract will not give rise to a cause of action in tort. *Brown v. South Carolina Insurance Co.*, 284 S.C. 47, 324 S.E.2d 641, 644–45 (S.C.App.1984). Actionable negligence requires an allegation that a party has breached some standard of conduct imposed by the law (apart from and independent of any contract) for the protection of others against unreasonable risks. *Courtney v. Remler*, 566 F.Supp. 1225, 1231 (D.S.C.1983), *aff'd*, 745 F.2d 50 (4th Cir.1984). The issue of whether a duty is owed under the facts presented by a particular case is a question of law for the court. *Ballou v. Sigma Nu General Fraternity*, 291 S.C. 140, 352 S.E.2d 488 (S.C.App.1986). Plaintiff has not identified any such duty that could have been breached in this case by Bristow's failure to keep the Borders/Bekms lease in existence. For that

---

5. When pressed as to his position on the applicability of the definition of "distributor" to his client, plaintiff's counsel conceded at the hearing on May 25, 1990, that "we have to come under the definition of 'retailer'."

reason, a negligence cause of action cannot survive.

Plaintiff's counsel argued at the hearing on May 25, 1990 that the recent South Carolina Supreme Court case of *Kennedy v. Columbia Lumber & Manufacturing Co.*, 299 S.C. 335, 384 S.E.2d 730 (1989) supports a negligence claim on these facts. In *Kennedy*, the court held that a builder who performs construction in such a way that he violates both a legal and a contractual duty may be liable both in tort and contract. The court recognized that a legal duty exists in this context (even though the buyer has suffered only "economic losses") where: "(1) the builder has violated an applicable building code; (2) the builder has deviated from industry standards; or (3) the builder has constructed housing that he knows or should know will pose serious risk of physical harm." *Id.*, 384 S.E.2d at 738.

*Kennedy* has no application to the facts of the present case. The supreme court in *Kennedy* simply applied the rather obvious rule that where both a legal and contractual duty are breached, a plaintiff may recover both in tort and contract. The court then looked for the source of the legal duty where a builder is alleged to have performed shoddy construction, and it found that duty to exist under the three circumstances listed above. The case does not eradicate the requirement for recovery in tort that plaintiff allege the breach of a legal duty. The court found that duty to exist on the facts before it; plaintiff has not identified any such legal duty here. For that reason, summary judgment is appropriate on plaintiff's second cause of action.

In addition to failing to identify any legal duty arising on these facts, plaintiff has failed to allege any conduct by defendants that could be considered a breach of a duty owed plaintiff. Defendants have cited plaintiff's deposition in which he states that he knows of no acts or omissions that may constitute negligence. In his deposition,

plaintiff admitted that he did not know the terms of the lease, and that he did not know whether defendants had violated those terms. Plaintiff stated that he knew only that defendants informed him that he had thirty days to get out. Deposition of Miller, pp. 27–30. Plaintiff has not alleged or argued any act or omission on the part of defendants that could be construed to violate a legal duty owed plaintiff.

■ In the hearing, plaintiff has also referred to the wrongful termination line of cases as support for his negligence cause of action. In *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099 (4th Cir.1971), the Fourth Circuit described South Carolina law as follows:

> Although some states may give full effect to broad unilateral powers of termination, South Carolina ... does not. It is settled law in that state that regardless of broad unilateral termination powers, the party who terminates a contract commits and actionable wrong if the manner of termination is contrary to equity and good conscience. That standard of conduct is far more stringent than one forbidding only actual fraud, and it may apply to an unconscionable reason for termination as well as to the causing of needless injury in the course of termination.

*Id.* at 1100. *See also Philadelphia Storage Battery v. Mutual Tire Stores*, 161 S.C. 487, 159 S.E. 825 (1931); *Gaines V. Harrison & Son v. J.I. Case*, 180 F.Supp. 243 (E.D.S.C.1960).

Although this language, taken out of context, appears to have potentially broad application, the Fourth Circuit has made clear that "[c]ourts applying South Carolina law have found wrongful termination only in extraordinary circumstances." *Richland Wholesale Liquors v. Glenmore Distilleries Co.*, 818 F.2d 312 (4th Cir. 1987).[6] In that case, the court explained:

> [A] termination is not wrongful if it is in accord with the parties' contract and the manner of termination is not contrary to

---

**6.** See the court's discussion of those cases and their extraordinary circumstances. 818 F.2d at 315.

equity and good conscience.... [D]isputed testimony about motivation does not present a jury question unless there is evidence of supplier behavior which is arguably arbitrary or malicious.

*Id.* at 315. The court explained that "arbitrary" in this context means "without reasonable business justification in ending the relationship." *Id.* at 316. The court went on to rule as a matter of law that defendant did not wrongfully terminate the contract because it "acted in accordance with its undisputed right to terminate the relationship and ... it had a legitimate business justification [for doing so]." *Id. See also Glaesner v. Beck/Arnley Corp.,* 790 F.2d 384 (4th Cir.1986) (court ruling as a matter of law that distributor did not wrongfully terminate distributorship since its stated reason was plaintiff's poor business practices and low sales).

It is undisputed in this case that defendants' termination of the Sublease and Agreement complied with the notice provisions of those contracts. Defendants have explained that the termination of those contracts came about as a result of Borders' cancellation of the ground lease after a dispute over the condition of the roof. There can be no better business justification for terminating the Sublease between plaintiff and defendants than the termination of the ground lease between Borders and defendants. Without that lease, defendants do not have the legal right, much less the obligation, to sublease the premises. Plaintiff contends that he "has every right to expect the Defendant would do everything reasonably within its power to keep the lease in effect," but he is requiring in that contention much more of defendants than did his Sublease, Agreement, or South Carolina's law on wrongful termination. Plaintiff has not shown any "malicious or arbitrary" conduct for which a wrongful termination cause of action would lie, and this court will not "second-guess the kind of business decisions at issue here." *Richland Wholesale Liquors,* 818 F.2d at 317. *See also Glaesner,* 790 F.2d at 388–390.

Because defendants' termination of the Sublease and Agreement was not "wrongful" as a matter of law, and because plaintiff has not shown any other legal duty to apply to these facts, defendants' motion for summary judgment as to the negligence claim is hereby granted. Rule 56, Fed.R. Civ.Proc.

### IV. *Breach of Contract/Third Party Beneficiary*

In his third cause of action, plaintiff alleges that as third party beneficiary to the lease between Borders and Bristow, he is entitled to recover for breach of that contract. In their motion for summary judgment, defendants responded that a third party beneficiary must be an *intended* beneficiary to recover, which, defendants assert, Miller is not. At the hearing on this motion held on May 24, 1990, plaintiff conceded this cause of action, agreeing that under South Carolina law, a party must be an *intended* beneficiary to recover under a third party beneficiary theory. *See generally* Restatement of Contracts, Second § 302. For that reason, defendants' motion for summary judgment as to the third cause of action is granted. Rule 56, Fed.R.Civ.Proc.

### V. *Antitrust*

Plaintiff has alleged in his fourth cause of action that "[t]he Defendants have used a consignment arrangement in order to illegally set the retail price of gasoline in Darlington County, South Carolina." Complaint, para. 24. Plaintiff did not clearly indicate in his complaint the specific bases upon which he intends to rest this claim; however, in his memorandum in opposition to this motion, plaintiff states that he is seeking recovery under the Sherman Act, 15 U.S.C. § 1 *et seq.* and the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39–5–20(a).

Defendants argue in their motion that the antitrust laws prohibit a seller from setting the prices for products purchased by a buyer for resale to the public, and do not apply to the arrangement in this case since Bristow retains title to the fuel until a consumer purchases it. Defendants as-

sert that Bristow has set only the price for the sale of its products; in other words, because Miller does not purchase the fuel and resell it, the antitrust laws are not implicated. Resolution of this issue requires close consideration of the law of vertical price fixing.

■ Vertical price fixing occurs when a person on the chain of distribution attempts to set the prices at which someone lower on that chain sells the goods. *See, e.g.,* 1 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 2.02[1][c][i]. Vertical price fixing is illegal per se under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1961); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). A consignment device that is, in fact, coercively employed retail price maintenance constitutes vertical price fixing and is thus illegal under the antitrust laws. *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). A consignment arrangement, however, does not constitute price fixing so long as the contractual relationship between the parties reflects a true consignment rather than a disguised sale of the goods. *Id.; Hardwick v. Nu–Way Oil Co., Inc.,* 589 F.2d 806 (5th Cir.1979), *reh'g denied,* 592 F.2d 1190 (5th Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

*Simpson v. Union Oil Co.* must be the starting point for an analysis of alleged vertical price fixing in the consignment context. In *Simpson,* the Supreme Court considered an antitrust claim brought by a year-to-year lessee of a retail outlet of Union Oil. Union Oil had required Simpson to sign a consignment agreement providing that title to the gasoline would remain in Union Oil, and that Union Oil would set the price of the gasoline. Under the agreement, Simpson was responsible for all losses of the gasoline except those due to acts of God. Simpson paid all costs of operating the outlet, and he was compensated by a commission tied to the retail price of the

gasoline. Union terminated the consignment agreement when Simpson sold gasoline below the price fixed by Union.

The Supreme Court held that the "consignment" at issue in that case was actually a retail price maintenance scheme and illegal under antitrust laws. The court noted that Simpson was, for all practical purposes, an "independent businessman" bearing the risk of loss and receiving a commission directly tied to retail prices. The court acknowledged the legitimacy of a true consignment, but then noted:

> When ... a consignment device is used to cover a vast gasoline distribution system, fixing prices through many retail outlets, the antitrust laws prevent calling the 'consignment' an agency.... The present, coercive 'consignment' device, if successful against challenge under the antitrust laws, furnished a wooden formula for administering prices on a vast scale.

*Id.,* 84 S.Ct. at 1057.

Although the precise reach of *Simpson* has been the subject of considerable debate, the courts seem to agree that the case has two main theoretical underpinnings: "The first element relied upon by the court was that the Union Oil 'consignees' were in fact independent businessmen having 'all or most of the indicia of entrepreneurs, except for price fixing.' ... The second element stressed by the court was the vastness of the distribution system and the pervasiveness of the price fixing accomplished by it." *Hardwick v. Nu–Way Oil Co., Inc.,* 589 F.2d at 809 (citations omitted). As the Fifth Circuit has recognized, *Simpson* did not sound the death knell for all consignment arrangements, and the applicability of that case's reasoning and rule depends upon the facts of each case. *Id.*

Several courts have considered whether particular contractual arrangements were actually sales (and thus fell within *Simpson's* holding) or were true consignments (and thus did not implicate the antitrust laws). *See, e.g., Call Carl v. BP Oil Corp.,* 554 F.2d 623, 626–28 (4th Cir.1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Hardwick,* 589 F.2d at

808–11. One commentator has stated that a transaction is more likely to be considered a sale than a consignment if the "consignee":

1) takes title to the goods at the time they are received;

2) is responsible for payment immediately upon delivery to him;

3) has the power to set resale prices;

4) must make substantial changes in the goods;

5) must bear the risk of loss; or

6) pays taxes on the goods as part of inventory.

1 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 2.02[1][c][i][A]. *Accord, Call Carl,* 554 F.2d at 626–28; *Hardwick,* 589 F.2d at 808–11.

■ It should be noted at the outset that not one of these indicia of sale is present in this case: (1) Defendants retain title to the goods until they are sold; (2) Plaintiff does not pay for the fuel when it is delivered (Instead, each week he remits to Bristow the proceeds from that week's sales, and receives his commission monthly); (3) Defendants have the sole authority to set the retail prices; (4) Plaintiff does not make any change in the fuel before it is sold; (5) Defendants bear the risk of loss except for losses resulting from plaintiff's negligent or criminal conduct; (6) Defendants pay the taxes on the fuel. All of the factors properly considered under this analysis point to the same inevitable conclusion: The contractual relationship between the parties was a true consignment not implicating the antitrust laws.

Both the Fifth Circuit case of *Hardwick* and the Fourth Circuit case of *Call Carl* support this conclusion. The facts of *Hardwick* are virtually identical to those presented in the present case. In considering the question of whether plaintiff was more properly characterized as an employee or independent operator, the court first noted that several attributes of an independent operator were present including: (1) The contract included a provision stating that the operator was to be considered an independent contractor; (2) Plaintiff ran a grocery store on the premises, and defendant did not participate in that business in any way; (3) Defendant did not pay Social Security taxes on or withhold income taxes from plaintiff's compensation; (4) the station operator was responsible for hiring personnel, paying taxes on the real estate, and paying the operating expenses; and (5) the station did not present itself as defendant's station. 589 F.2d at 809–10.

Despite these indicia of independent operation, the court found that the relationship was ultimately defined by the many attributes of employment, including: (1) Defendant had the right to install at its own cost all of the equipment necessary to operate a self-service gasoline station; (2) Defendant retained ownership of that equipment and repaired it at its own expense; (3) Plaintiff did not carry insurance on the equipment; (4) Plaintiff did not pay any taxes on the gasoline or on the equipment; (5) Defendant acquired all applicable licenses required by law for the gasoline sales operation; (6) Plaintiff was paid a fixed salary not tied to the retail price of the gasoline or the number of gallons sold; (7) The contract provided that plaintiff was a "consignee" of defendant; (8) Plaintiff's only responsibility was to verify the amount of gasoline purchased, collect the money from customers, and deposit the funds into a bank account. *Id.* at 810. The court distinguished *Simpson* by pointing out that the plaintiff in *Simpson* assumed the risk of loss, and that plaintiff had no guaranteed income if prices set by the defendant were not competitive. *Id.*

*Hardwick* compels the conclusion here that plaintiff was a true "consignee" for purposes of antitrust analysis. Although the same indicia of independent operation that were present in *Hardwick* are also present here (including the use of the term "independent contractor" in the Agreement), the indicia of employment that led to the court's conclusion in that case require the same result in this case. Defendants owned the equipment and were responsible for its upkeep. Defendants paid the taxes on the equipment and fuel. Defendants assumed the risk of loss (and carried liability insurance), except for those losses re-

sulting from plaintiff's negligent or criminal conduct. Plaintiff's responsibilities with regard to dispensing the fuel at this self-service facility were minimal. Plaintiff was guaranteed a monthly income of $200 per month during those months that plaintiff failed to sell at least four thousand gallons of fuel. Finally, plaintiff's option of five cents per gallon sold was not contingent on defendants' having a five cent gross profit margin during any particular month. All of these factors place this case squarely within the analysis and conclusion offered by the *Hardwick* court. This court agrees with defendants that "this case is not *Simpson*." [7]

Finally, the Fourth Circuit case of *Call Carl* also supports this conclusion. In that case, the court considered whether ten independent service station operators were BP employees or independent operators. The court, considering many of the same factors listed in *Hardwick*, concluded that plaintiffs were simply employees of BP for purposes of antitrust analysis:

> While BP's I-manager scheme is not totally devoid of indicia of independent operation, in that the I-manager is paid by commission rather than salary, and is responsible for paying the salaries of subordinate employees and any cash shortages that may occur, the rights and responsibilities of an I-manager irrefutably place him in the category of a BP employee. In contrast to the situation in *Simpson*, BP pays all costs of station operation, except for the station payroll, and is responsible for accidental losses of gasoline on the station premises. BP pays all sums for Social Security, unem-

ployment compensation and workmen's compensation with respect to the I-manager and his subordinates. Finally, an I-manager, unlike an independent operator, can be discharged like any employee on twenty-four hours notice. Had the judgment of the district court not held an I-manager to be in fact an employee, we would have been required to set it aside.

554 F.2d at 628. Although defendants in the present case do not pay Social Security, unemployment compensation, or workmen's compensation, the remaining factors considered by the *Call Carl* court all point toward the conclusion that plaintiff was an employee of defendants for purposes of dispensing the fuel. For that reason, the consignment arrangement does not implicate the antitrust laws and summary judgment is appropriate.[8]

Plaintiff has also indicated that his fourth cause of action is intended to include the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39–5–20 (SCUTPA). That section provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C.Code Ann. § 39–5–20(a). A claim under the SCUTPA must allege behavior that affects the public interest. *Noack Enterprises, Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (S.C.App.1988). The courts in interpreting the SCUTPA are to be guided by the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (FTC Act) and federal judicial interpretations of the FTC Act. *State ex rel. McLeod v. C & L Corp., Inc.*, 280 S.C. 519, 313 S.E.2d 334 (S.C.App.

7. The second underpinning of *Simpson*, the existence of a vast distribution scheme, is also absent in this case. Plaintiff has offered no evidence that this Darlington County distributor's scheme was sufficiently far-reaching to come within the holding of *Simpson*.

8. In addition to *Simpson*, plaintiff relies primarily on *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir.1986). In *Murray*, the Seventh Circuit considered a producer's termination of one of its wholesale distributors, alleged to have occurred pursuant to a price-fixing conspiracy. In arriving at its conclusion that plaintiff had failed to prove that the termination resulted from a conspiracy, the court noted that the

antitrust laws cannot be circumvented by substituting a consignment contract for a normal sales contract. *Id.* at 1436. The court stated, "They would still be dealers; and if the law forbids the supplier to fix the retail price when title passes, it is not apparent why it should permit him to fix that price when title is retained." *Id.* This court is not faced with the task of deciding the reach of the antitrust laws when every factor except the passing of title indicates that defendant is a dealer. As this court has pointed out, most of the indicia of a true consignment relationship are present in this case. For that reason, this dictum from *Murray Biscuit* adds little to the analysis.

1984). The scope of the SCUTPA is not strictly tied to the FTC Act, however, and may extend to conduct which would give rise to a cause of action for wrongful termination under South Carolina common law. *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1220 (4th Cir.1983), *cert. denied*, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).

While it is true that an anticompetitive practice falling short of a Sherman Act or Clayton Act violation may nonetheless violate the FTC Act, *see, e.g., Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–44, 92 S.Ct. 898, 903–05, 31 L.Ed.2d 170 (1972), the scope of the FTC Act is directly linked to the antitrust laws. The Federal Trade Commission can declare a practice "unfair" if that practice "conflict[s] with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate those laws." *Federal Trade Comm'n v. Brown Shoe Co.*, 384 U.S. 316, 321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966). The FTC Act was designed "to stop in their incipiency acts and practices which, if full blown, would violate [the Sherman and Clayton] acts." *Federal Trade Comm'n v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 395–95, 73 S.Ct. 361, 363–64, 97 L.Ed. 426 (1953), *reh'g denied*, 345 U.S. 914, 73 S.Ct. 638, 97 L.Ed. 1348 (1953).

As this court has pointed out, the relationship between the parties does not violate the Sherman Act.[9] In addition, the termination by defendants was not "wrongful" under South Carolina common law principles.[10] Following these conclusions, it is difficult to see how the SCUTPA is implicated by a legitimate consignment relationship and its necessary termination. While this court acknowledges that the FTC Act reaches more broadly than the Sherman Act, and that interpretations of the FTC Act are to be used in applying the SCUTPA, plaintiff has failed to show how the circumstances of this case bring it within the reach of the FTC Act. Instead, plaintiff has simply argued that the termi-

nation of the Agreement by Bristow was "unfair." The SCUTPA does not prohibit all business activities that someone may consider "unfair," however. Plaintiff has failed to cite any federal or state case in which a consignment relationship such as the one at issue in the present case has been held to violate the FTC Act or the SCUTPA. There is no allegation that the termination was in furtherance of an anticompetitive scheme as was the case in *Bostick*, 702 F.2d at 1220. This arrangement is not a budding violation of the Sherman Act that the FTC Act is designed to remedy at an early stage; rather, the consignment relationship is a valid business arrangement. And it is difficult to identify any policies expressed in the Sherman Act that would be furthered by disallowing under state law principles a valid consignment relationship. Although possibly "unfair" from plaintiff's perspective, neither the consignment arrangement itself nor the termination of the Sublease and Agreement can be considered a violation of the SCUTPA.

## VI. *Conclusion*

Based upon the foregoing reasoning and cited authorities, this court concludes that no triable issue of fact is present in the case, and that the law supports defendants' position on each cause of action. For that reason, defendants' motion for summary judgment is hereby granted. Rule 56, Fed. R.Civ.Proc.

IT IS SO ORDERED.

---

**9.** *See* discussion *supra,* pp. 1051–54.

**10.** *See* discussion *supra,* pp. 1050–51.