**RICHLAND WHOLESALE LIQUORS,**
**Plaintiff-Appellee,**

v.

**GLENMORE DISTILLERIES COMPANY; Mr. Boston Distiller Corporation; Foreign Vintages, Inc., Defendants-Appellants,**

**and**

**Foremost McKesson, Inc., Defendant.**

No. 86–3052.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1987.

Decided May 8, 1987.

---

James Lee Harlow (E. Anne McKinsey, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., William C. Hubbard, Barbara H. McArthur, Nelson, Mullins, Grier & Scarborough, Columbia, S.C., on brief), for defendants-appellants.

Harold Weinberg Jacobs (James L. Werner, Russell T. Burke, Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C., on brief), for plaintiff-appellee.

Before HALL and ERVIN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

Glenmore Distilleries Company ("Glenmore")[1] appeals a judgment entered upon a jury verdict in favor of Richland Wholesale Liquors ("Richland") in Richland's action for wrongful termination of its liquor distributorship and for violations of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C.Code Ann. § 39–5–10–560.[2] The jury awarded Richland $1,000,000 in actual damages and $2,000,000 in punitive damages. By an amended judgment, the district court trebled the $1,000,000 award pursuant to SCUTPA. We reverse and remand for entry of judgment in favor of Glenmore.

### I.

In 1982, Richland was the second largest distributor of alcoholic beverages in South Carolina. It had been Glenmore's exclusive wholesale distributor in that state from 1935 until April 1, 1983, when appellant terminated the distributorship. The parties had no written agreement between them and it was understood that either one could cease dealing with the other at any time for any reason.

The cause of Richland's termination by Glenmore was hotly disputed. According to Glenmore, the termination was the result of a precipitous decline in Richland's sales of Glenmore's products from 66,000 cases a year in 1979 to approximately 48,000 cases by the end of 1981 and to 43,000 cases by the end of 1982. In March, 1982, and again the following May, Glenmore's recently appointed sales director, James McConville, met with Richland personnel to discuss the sales situation, which Richland attributed to downward trends in the marketplace and a faltering state economy. Following the May meeting, McConville, unknown to Richland, met with Lloyd McNair, the manager of McKesson, anoth-

1. Appellants are Glenmore Distilleries Company and two wholly-owned subsidiaries, Mr. Boston Distiller Corporation and Foreign Vintages, Inc. They are referred to here collectively as Glenmore.

2. Richland had originally sued under the Sherman Anti-Trust Act and the Clayton Act as well as under South Carolina common law for the wrongful termination of its liquor distributorship and under SCUTPA. Before trial, plaintiff dismissed all of its antitrust claims and proceeded only on its common law and SCUTPA claims. These state claims were asserted under diversity and pendent jurisdiction.

er liquor distributor, and discussed the possibility of McKesson distributing a line of Glenmore's wine, as well as McNair's interest in distributing all of Glenmore's products.

In June, 1982, McConville decided to set up a performance program for Richland and compiled a series of proposed depletion, distribution, and merchandising goals for discussion. At an August 9, 1982, meeting, McConville presented these goals to Richland in writing, along with other data showing that Richland's sales decline was continuing and a warning that a transfer of the Glenmore product line to another distributor might be recommended. When Richland raised complaints about a number of the goals that it found to be unreasonable, McConville agreed to an extension of time to meet some of them. McConville also noted, under each category of goals and for each product, the depletion and distribution goals which Glenmore desired and the depletion and distribution goals which Richland proposed.

McConville's next meeting with Richland occurred on December 7, 1982, when McConville reported, in writing, on Richland's performance measured against both Glenmore's and Richland's goals. He found that, although there had been some sales gains, Richland had failed to meet eight of its own seventeen depletion goals and ten of the seventeen Glenmore depletion goals. He also found that although Richland had met the majority of its own distribution goals, it had failed to meet the majority of Glenmore's distribution goals. Finally, McConville concluded that Richland had failed to meet six of seven mutually agreed-upon merchandising goals.

After the meeting on December 7, McConville met with McNair at McKesson and told him that if he was still interested in carrying the Glenmore product line, he should submit a formal solicitation containing sales and distribution commitments. McNair subsequently submitted a formal solicitation, which McConville forwarded to his home office with a recommendation to implement the transfer.

In February, 1983, Glenmore decided to transfer its product line from Richland to McKesson, effective April 1, 1983, based on the continuing decline in Richland's sales, the dominance of other suppliers at Richland, the comparative management strengths of Richland and McKesson, and the distribution and sales commitments that McKesson had made. Glenmore communicated that decision to Richland on February 14, 1983.

Between the announcement of the transfer and the actual transfer date, Richland continued to purchase Glenmore products and, according to the trial testimony of William Smith, Sr., Richland's president, continued to sell them at a profit, fully recouping its investments and making profits of between $600,000 and $700,000 annually on the sales. Following the transfer, Glenmore repurchased its inventory from Richland for approximately $185,000. During its first full year of distributing Glenmore's products, McKesson posted an increase of at least 6,000 cases over the sales achieved by Richland during its last full year of distribution.[3] Ultimately, Glenmore, which had been the number five supplier at Richland, became the number two supplier at McKesson.

Richland's account of the situation was substantially different. According to Richland, its relationship with Glenmore had been excellent for nearly 48 years and, before mid–1982, appellant had never criticized Richland for its performance as a distributor. Richland points out that, as recently as 1980, Glenmore's South Carolina sales manager had received the largest bonus of any Glenmore sales representative in the Southern region. Moreover,

---

**3.** Glenmore's statistics demonstrated an increase in sales of 9,500 cases. However, at trial, Richland's president attributed McKesson's increase to Glenmore's promotional efforts after the product line transfer and the availability of new products to McKesson that were not available to Richland. Glenmore then introduced unrebutted evidence showing that, even excluding products that Glenmore had promoted and new products that Glenmore had introduced through McKesson, McKesson nevertheless produced a 6,000–case increase in sales over Richland's sales.

Richland maintains that its sales in South Carolina continued to meet or exceed the sales performance of other distributors in the states comprising Glenmore's southern region up until the time of the termination.

Richland points to the fact that in January, 1982, McKesson, which was Glenmore's distributor in Arizona, had been notified that its distributorship in that state would be terminated as of March, 1982, and that on March 30, 1982, McKesson filed a breach of contract action against Glenmore in Arizona, challenging the termination. In early April, McKesson's president entered into discussions with Glenmore concerning the transfer to McKesson of Glenmore's distributorships in several other states, including South Carolina, and on April 29, 1982, McKesson dismissed its Arizona lawsuit against Glenmore. That same day, McKesson's attorney wrote a letter to Glenmore's attorney, stating that the dismissal of the lawsuit was a demonstration of McKesson's good faith in the continuing negotiations with Glenmore. Richland contends that the settlement of the Arizona case was the real motivating factor behind appellant's termination of its distributorship. Richland further maintains that it incurred additional and unnecessary expenses when it dramatically increased its marketing activities for Glenmore products in an attempt to meet what it perceived to be Glenmore's unreasonable performance demands.

In March, 1983, Richland filed the instant action against appellant. The parties' conflicting view of events was submitted to the jury, which found that Glenmore's termination of Richland violated equity and good conscience, as well as SCUTPA.

This appeal followed.

## II.

On appeal, Glenmore contends that it was entitled to a directed verdict on Richland's claims of wrongful termination of the distributorship and violation of SCUTPA. We agree.[4]

Courts applying South Carolina law have found wrongful termination only in extraordinary circumstances. *Cf. Philadelphia Storage Battery Co. v. Mutual Tire Stores*, 161 S.C. 487, 159 S.E. 825 (S.C.1931) (distributor terminated at the height of the selling season without notice); *Gaines W. Harrison & Sons, Inc. v. J.I. Case Co.*, 180 F.Supp. 243 (E.D.S.C.1960) (distributor terminated without notice in order for the supplier to avoid warranty obligations and destroy distributor's business, 90% of which was dependent on supplier's products); *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099 (4th Cir.1971) (termination of a distributor who had invested heavily in specialized equipment, parts and tools, without any buy-back). *See also, Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207 (4th Cir.), *cert. denied*, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983) (jury entitled to determine whether distributor terminated in furtherance of anticompetitive purposes).

Recently, in *Glaesner v. Beck/Arnley Corporation*, 790 F.2d 384 (4th Cir.1986), this Court had occasion to consider South Carolina's law on the wrongful termination of distributorships. We concluded that a termination is not wrongful if it is in accord with the parties' contract and the manner of termination is not contrary to equity and good conscience. *Id.* at 386. Moreover, we found that disputed testimony about motivation does not present a jury question unless there is evidence of supplier behavior which is arguably arbitrary or malicious. Although the district court did not have the benefit of our *Glaesner* decision when the instant action was tried and decided, we find that the clarification of South Carolina law articulated in *Glaesner* is dispositive and mandates a directed verdict in appellant's favor.

*Glaesner* involved a dispute between a local distributor of foreign auto parts, Frederick R. Glaesner, and its national supplier, Beck/Arnley Corporation, which, as in the present case, culminated in an action

---

4. Because of our disposition, we do not address appellant's additional contentions concerning error in the admission of evidence and in the damages awards.

under South Carolina law for wrongful termination of the distributorship and violation of SCUTPA and in a jury award of damages to the distributor. Glaesner had contended that his termination was the result of a scheme by Beck/Arnley to get rid of useless and unsaleable parts, while Beck/Arnley maintained that it had ended the relationship due to Glaesner's poor business practices and low sales. We held that the trial court erred in submitting the dispute to the jury, concluding that:

> Such divergent versions of the facts and reciprocal casting of blame are common when expectations engendered by business dealings fail to materialize. Mutual recrimination and suspicion may typify times when profits are low and dealings turn sour. Such differing views do not, however, ordinarily give rise to an action in tort or create a jury question as to which party's version of business reality is the right one. Rather, recourse is normally had to the terms of the contract which the parties themselves negotiated and to the business setting in which that contract took form.

*Id.* at 387.

█ We noted that the terms of the distributorship agreement between Glaesner and Beck/Arnley provided for termination by either party without cause, upon giving one month's notice, and that Beck/Arnley had not only complied with the notice requirement but, in addition, had offered to sell to Glaesner for an additional ninety days to give him time to find new suppliers. We further recognized that, pursuant to well-settled South Carolina case law, in order to establish a claim of wrongful termination the supplier must be shown to have acted maliciously and without reasonable business justification in ending the relationship. Applying this law to the controversy in *Glaesner*, we then found that:

> Glaesner ... failed to produce evidence sufficient to permit a jury to find that Beck/Arnley acted in this fashion. There was no evidence, for example, that the parts were different from parts routinely distributed to other dealerships, or that they were damaged, or that they had been rejected by another buyer, in short, no circumstantial evidence of the sort that would permit the jury to infer wrongdoing. There is also a complete absence of any direct evidence that Beck/Arnley deliberately plotted to saddle Glaesner with parts it knew he could not sell. Without such evidence, Glaesner's charges are too speculative for submission to a jury.
>
> Beck/Arnley, moreover, had easily comprehensible business reasons for terminating Glaesner, and, though it was not Glaesner's exclusive supplier, it carried out the termination in a manner calculated to provide Glaesner with ample opportunity to adjust.

*Id.* at 389 (citations omitted). Finally, we concluded that:

> While supplier behavior that is arguably arbitrary or malicious would present a question for the jury, South Carolina law has never equated the exercise of reasonable business judgment with an act of tortious bad faith.

*Id.* at 390.

█ Similarly, in the instant case, we conclude that Glenmore's termination decision was supported by a reasonable business justification and carried out in a manner which was not contrary to equity or good conscience. Richland argues that our decision in *Glaesner* is not controlling here, because (1) Glenmore had a secret agreement with McKesson to transfer Richland's profitable South Carolina distributorship to that firm in return for the dismissal of McKesson's Arizona lawsuit and (2) Glenmore required Richland to meet outrageous performance goals in order to manufacture a business justification for the termination. According to Richland, the presence of these factors demonstrate a sufficient degree of malice or arbitrariness to sustain a jury finding in its favor. We are not persuaded.

It is clear that appellant acted in accordance with its undisputed right to terminate the relationship and that it had a legitimate business justification for transferring the distributorship to McKesson. The parties agree that Richland's sales of Glenmore

products had declined. They only dispute the reason for the decreased sales. Other evidence showed that while Glenmore was the number five supplier at Richland, it became the number two supplier at McKesson and that McKesson increased the sales of Glenmore's products by at least 6,000 cases in its first year of distribution.

■ Even if there had been a prior, secret agreement with McKesson to transfer the distributorship, that fact neither defeats the legitimacy of Glenmore's business decision to terminate Richland nor gives rise to a tort action for wrongful termination. The malice required under South Carolina law, as *Glaesner* makes clear, is not directed to the intent or motivation behind the termination of the contract. Rather, the focus is on whether there was malicious or arbitrary conduct in bringing about the termination.

Glenmore's lack of malice in effecting the termination here is obvious. Not only did it give Richland written notice that it was considering the termination six months before making its final decision, but before giving the notice it met with Richland a number of times to discuss its concerns about the sales situation. After giving notice, Glenmore continued to fill Richland's orders and Richland continued to sell Glenmore's products. Moreover, Richland's president testified that the company fully recovered all of its investments in Glenmore's products and profited from these investments in an amount of up to $700,000 a year. At the time of the termination, Glenmore bought back all of its products from Richland's inventory. Finally, far from being put out of business as a result of the termination, Richland continued distributing its many other brands.

Richland's second argument—that it was needlessly induced to expend time and money to promote Glenmore products, when Glenmore knew it would later terminate Richland—is equally unavailing. In the first place, Richland agreed with at least some of the proposed performance goals. More importantly, it conceded that it had suffered no damages as a result of the performance program, having recouped all of its investments in promoting Glenmore's products and having reaped profits far in excess of those investments.[5] *Cf. Burger Brewing Co. v. Summer*, 261 F.2d 261, 263 (4th Cir.1958) (reversal of damage award to beer wholesaler with a non-exclusive agency for no fixed duration, who fully recouped his expenses and whose inventory was repurchased upon termination).

■ *Glaesner* makes clear that it is not for courts or juries to second-guess the kind of business decisions at issue here. Accordingly, we hold that the trial court erred in submitting this case to the jury. Moreover, given the absence of wrongful termination, Richland's SCUTPA claim also must fail. *Glaesner, supra* at 390.[6]

### III.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for entry of judgment in favor of Glenmore.

REVERSED AND REMANDED.

---

5. Richland argues on appeal that its profits were reduced and its product line with other suppliers was harmed as a result of the performance program instituted at Glenmore's insistence. However, it does not appear that Richland ever made such a claim below. Furthermore, appellee has directed us to no evidence in the record which would support such a conclusion.

6. We further note that in this case Richland neither alleged nor proved any impact on the public interest as a result of Glenmore's termination of the distributorship. Under a recent decision of South Carolina's intermediate court of appeals, an unfair or deceptive act or practice that affects only the parties to a trade or commercial transaction and does not have an impact on the public interest is beyond the scope of SCUTPA. *Noack Enterprises, Inc. v. Country Corner Interiors*, 351 S.Ed.2d 347 (S.C.App. 1986).