37 F.3d 1492
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 BIOPRODUCTS, INC., Plaintiff-Appellant,
v.
INGREDIENT SPECIALTIES, INCORPORATED, Defendant-Appellee.
BIOPRODUCTS, INC., Plaintiff-Appellee,
v.
INGREDIENT SPECIALTIES, INCORPORATED, Defendant-Appellant.
 Nos. 93-1059, 93-1109.
 United States Court of Appeals, Fourth Circuit.
 Argued April 12, 1994.
Decided October 18, 1994.
 
 1
 Appeals from the United States District Court for the District of South Carolina, at Charleston. Charles E. Simons, Jr., Solomon Blatt, Jr., Senior District Judges. (CA-90-2482-2)
 
 
 2
 Argued: G. Dana Sinkler, Warren & Sinkler, Charleston, SC, for appellant.
 
 
 3
 Argued: Saul Gliserman, The Richter Law Firm, P.A., Charleston, SC. On brief: Lawrence E. Richter, Jr., The Richter Law Firm, P.A., Charleston, SC, for appellee.
 
 
 4
 D.S.C.
 
 
 5
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 6
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 OPINION
 PER CURIAM
 
 7
 Ingredient Specialties, Inc. marketed and sold pet food products produced by appellant, Bioproducts, Inc., for a period of ten years pursuant to an unwritten agreement. During that time, Bioproducts was purchased by Nutrius, a subsidiary of Mitsui, and the management of the company changed hands. Several years after the acquisition, Bioproducts terminated its arrangement with Ingredient Specialties. In response, Ingredient Specialties refused to forward approximately $220,000 that it owed to Bioproducts. Bioproducts brought suit alleging breach of contract to recover the money owed for goods sold and delivered and alleging breach of contract accompanied by a fraudulent act to recover damages. Ingredient Specialties filed counterclaims including one based on Bioproducts' unconscionable termination of its contract.
 
 
 8
 The district court granted summary judgment for Bioproducts on its breach of contract claim, awarding the company $219,452.93, but the court deferred entry of judgment until after a jury trial on the other claims and counterclaims. The jury returned a verdict of $10,000 in punitive damages in favor of Bioproducts on the fraud claim, and a $150,000 compensatory and punitive damages award for Ingredient Specialties based on Bioproducts' unconscionable termination of the contractual relationship. Both parties have appealed the judgments adverse to their own interests. Because we agree with the district court's reasoning on the breach of contract claim, we affirm the award of summary judgment in favor of Bioproducts. The $10,000 in punitive damages awarded to Bioproducts by the jury based on a finding of fraud is also affirmed. However, because the district court erred by failing to find as a matter of law that the agency was one terminable at will without notice or, in the alternative, that the notice given was reasonable, the jury verdict in favor of Ingredient Specialties must be nullified.
 
 BACKGROUND
 
 9
 Bioproducts manufactures ingredients that are incorporated into pet food to enhance its palatability. Ingredient Specialties is an independent marketing agent which sells the ingredients produced by companies such as Bioproducts to pet food manufacturers such as Alpo. Ingredient Specialties, founded as a sole proprietorship by Joseph C. Leyh in 1980, became a Michigan corporation of which Leyh was the sole shareholder in mid-1982.[1]
 
 
 10
 Prior to the time he established Ingredient Specialties, Leyh became familiar with Bioproducts while working for Quaker Oats and, later, for the Peterson Company, which represented Bioproducts and other pet food ingredient manufacturers. Contemplating striking out on his own, Leyh contacted James Corkill, one of the shareholder/officers of Bioproducts, about establishing a working relationship in 1980. Corkill expressed an interest in Leyh's new company, and, early in 1981, Bioproducts responded positively to a marketing proposal Leyh had submitted. Although Bioproducts and Ingredient Specialties did not execute a written agreement, Leyh began marketing and selling Bioproducts' products. Leyh testified that Bioproducts, a manufacturer of ingredients used in pet food formulation, did not have any sales or marketing forces in its organization that would allow the company to penetrate effectively the pet food industry in 1981. For the first few years of their relationship, Leyh was the sole marketing representative for Bioproducts. In late 1981, Leyh obtained the Alpo account, which provided a large portion of Ingredient Specialties' income from the relationship with Bioproducts.[2] Beginning in December 1982, Leyh made several attempts to obtain a written agreement with Bioproducts. None were successful.
 
 
 11
 For six of the ten years in which Ingredient Specialties marketed and sold Bioproducts' products, Bioproducts was primarily owned and operated by three individuals and their families--Richard Carruthers, James Corkill, and Michael Murphy. On December 31, 1986, Nutrius, an Ohio corporation and a subsidiary of Mitsui, purchased Bioproducts. Initially operated as a subsidiary of Nutrius, Bioproducts ultimately merged into Nutrius which then changed its name to Bioproducts.[3] Many changes occurred in the relationship between Bioproducts and Ingredient Specialties between 1980 and 1990 involving the nature of the work that Ingredient Specialties was doing for Bioproducts, the scope of Leyh's responsibilities, and Leyh's relationship to the customers.
 
 
 12
 The parties dedicated much of their briefs to a description of the role Leyh and Ingredient Specialties played with respect to Bioproducts in the pet food business. Bioproducts has described Leyh as a marketing agent who received money (either commission or profits on direct sales) for marketing Bioproducts' products. Ingredient Specialties has characterized Leyh's role as a far more expansive one including services far beyond those provided by the typical broker or agent. Bioproducts has attempted to draw a distinction between the role Ingredient Specialties played with the former Bioproducts and the role with post-acquisition Bioproducts. Acknowledging that Ingredient Specialties' role may have been more multi-faceted during the early years, Bioproducts has demonstrated the limited role that Leyh played in the post-acquisition organization. In any event, the record clearly shows that the inability to create and agree on a written contract began under the auspices of the old Bioproducts and continued after the acquisition.
 
 Pre-Acquisition Bioproducts
 
 13
 Although Leyh was the sole marketing agent with Bioproducts from 1981 until June 1984, Bioproducts hired Bob Barricks, an in-house marketing and sales representative in 1984. In late 1984, after Bioproducts had hired Barricks, Bioproducts wrote a letter to Ingredient Specialties describing the services Bioproducts would expect from Leyh in 1985. Bioproducts requested advertising in a major pet food industry magazine, a marketing information service, and new sources and ideas for ingredients. In the same letter, Corkill said Bioproducts would pay for Ingredient Specialties' advertising costs and time and effort as well as a mark-up on any ingredient that Ingredient Specialties sold to Bioproducts.[4] Corkill made clear that Ingredient Specialties' biggest area of importance was the sales effort. Bioproducts outlined a billing plan for 1985 under which Ingredient Specialties would sell the product to the client, the client would pay Ingredient Specialties, Bioproducts would ship the product to the client and invoice Ingredient Specialties, and, finally, Ingredient Specialties would pay Bioproducts the cost of the product and keep a percentage of the sales price as profit.
 
 
 14
 In January 1985, Bioproducts implemented "Trio Management." While Corkill had been Leyh's primary contact prior to 1985, Trio Management entailed the more active participation and joint decision-making of the three owners of Bioproducts. In January 1985, Bioproducts adopted the method of paying Ingredient Specialties described in Corkill's letter. Prior to that time, Ingredient Specialties had been rewarded with commissions on sales of Biodigest to accounts within the area of Ingredient Specialties' territorial responsibility. For a period of time, Ingredient Specialties had also received commissions on house accounts not directly served by Ingredient Specialties. After January 1985, however, Leyh no longer received commissions for activity on in-house accounts which sales Ingredient Specialties was not making directly. All commissions were discontinued, and Ingredient Specialties began "jobbering" Biodigest only to those customers established by Ingredient Specialties.
 
 
 15
 In a letter to Barricks in April 1985, Leyh explained that the commissions Ingredient Specialties had received in the early years had filled the gap that otherwise existed between the services provided and the remuneration received. Leyh felt he provided a number of other services to Bioproducts besides sales which were not being compensated directly. With the eradication of the commission system, Leyh suggested that Bioproducts should reimburse Ingredient Specialties for technical consulting and other services associated with consulting. Leyh's suggestion led to a series of letters between the companies in an attempt to negotiate a written contract, but the agreement never materialized. Leyh continued to try to negotiate a written agreement acceptable to both Ingredient Specialties and Bioproducts throughout 1985 and 1986 but never met with success. Bioproducts never at any time agreed to pay a flat rate for Ingredient Specialties' marketing information system or technical support. All of the later negotiations involved some discussion of termination provisions, but, as noted, none of the negotiations resulted in a written agreement.
 
 
 16
 According to Bioproducts, a final disagreement surfaced prior to the acquisition in which Leyh claimed entitlement to approximately $4,800 in commissions for product shipped from Bioproducts to Doane, a co-packer for Alpo.[5] Corkill denied any obligation to pay any type of commission or fee to Ingredient Specialties regarding house accounts such as Doane for which Ingredient Specialties had not provided any services. Corkill accused Leyh of "posturing for the potential new owner of Bioproducts."
 
 
 17
 Immediately prior to the acquisition, Ingredient Specialties still had not obtained a written agreement with Bioproducts. Both Barricks and Ingredient Specialties were responsible for marketing. Ingredient Specialties was not working on a commission basis. Rather, Ingredient Specialties purchased from Bioproducts, and clients purchased at a marked-up price from Ingredient Specialties. Bioproducts had rejected all proposals for separate, flat-rate remuneration for marketing systems and technical services.
 
 Post-Acquisition Bioproducts
 
 18
 When the acquisition took place, John Orendorff, the new President of Bioproducts, asked Barricks to evaluate the relationship between Bioproducts and Ingredient Specialties. Barricks evaluated several courses of action including 1) the termination of the relationship with Leyh; 2) hiring Leyh as an employee of Bioproducts; and 3) the continuation of the relationship as it was. Barricks recommended that Bioproducts maintain the relationship with Ingredient Specialties as it stood at the time, and Orendorff accepted that proposal. Orendorff testified that Bob Barricks concluded that maintaining the relationship as it was provided the best alternative because Leyh "was servicing accounts for customers that he knew well, it would allow him to keep those customers, and it would also hopefully give us some contact with very large accounts that we didn't have at this point in time, which was Alpo and perhaps Gaines Companies, Research and Development." Orendorff also acknowledged in testimony that one of the "cons" to terminating the relationship altogether was that, with respect to the four accounts serviced by Joseph Leyh, including Alpo, Gaines, Dad's, and Martha White, "we were not real sure of the loyalty that those accounts had to Joe. Would they say, well, if Joe's out of the picture, will the customer go someplace else?"
 
 
 19
 Although Bioproducts decided to continue working with Leyh on the same basis as the old management, the new Bioproducts clearly had a different management strategy. Some accounts, formerly Leyh's, were taken over entirely by Bioproducts.[6] Very early in 1987, Barricks sent Leyh a memo stating that Bioproducts was going to make changes in advertising "eliminating [Ingredient Specialties'] involvement with Bioproducts." Prior to the acquisition, it had been the accepted practice that Leyh dealt with his customers, including Alpo, alone. After the acquisition, Bioproducts' new management insisted that Barricks and Christine Zorich attend the meetings with Leyh's clients.[7] The new management preferred to work with inside people as a rule, but, in any event, wanted representatives from the company to go along with the outside agent when an outside agent was used. Steve Latta, the General Manager, informed Leyh soon after the acquisition that he preferred to work with inside people, but that he was willing to continue the relationship with Ingredient Specialties as before.
 
 
 20
 Zorich testified that, soon after the acquisition, Latta called her and Barricks into his office to express concern over the fact that Leyh was the primary contact with Alpo. He instructed both Zorich and Barricks to "get in as soon as possible and resolidify those contacts." Zorich testified that she and Barricks were uncomfortable with that because "it was contrary to what the agreement was. That was Joe's customer, and was not an account that Bob would handle...." In February 1987, one month after the acquisition, both Bioproducts' employees accompanied Leyh to Alpo.[8]
 
 
 21
 As early as May 1987, Leyh again began negotiating with the new Bioproducts management for a written sales agreement. His requests were similar to those that the old management had rejected. Yet again, Ingredient Specialties and Bioproducts could not come to an agreement on written terms.
 
 
 22
 In April 1989, Bioproducts made a presentation to Alpo promoting a new formula called Bioflavors intended to replace 24-M, a formula that Leyh had been instrumental in formulating which contained the ingredient Peptone. Bioproducts acquired Peptone, an ingredient increasing palatability, from Leyh who had, in turn, acquired it from the manufacturer. Leyh was notified about Bioflavors at the last minute and had little input into the presentation. He testified that he knew nothing about Bioflavors prior to the April presentation. Soon after that event, Leyh began developing his own competitive formula for potential sale to companies like Alpo. Bioproducts has taken the position that it introduced the new formula to Alpo merely because it was a new possibility on the market, and that Bioproducts had no intention whatsoever of closing Leyh out of the Alpo account if the new formula were accepted. Bioproducts never made its intentions known to Leyh with respect to the new product.[9]
 
 
 23
 In September 1989, Latta and Leyh attended the annual Pet Food Industries Convention. Just prior to that convention, Leyh testified that he learned through the grapevine that Bioproducts had gone to Quaker to make a presentation without Leyh although Ingredient Specialties had formerly been the primary agent on the Quaker account. Latta and Leyh had several disagreements during the course of the annual meetings, and Latta informed Leyh that the relationship between Ingredient Specialties and Bioproducts was going to be brought to an end. Leyh testified that he considered the conversation notice of Latta's intent to terminate the relationship.
 
 
 24
 In December of 1989, Leyh sent his own test formula to Alpo, which, if successful, could have been sold as a competing product to displace Bioflavors offered by Bioproducts. Leyh did not inform Bioproducts of his actions with respect to Alpo. Leyh testified that he believed that Bioproducts was not entitled to information regarding his test formula because Bioproducts had, in April 1989, already introduced a competitive product to the 24-M he was currently selling for Bioproducts. Latta learned of Leyh's initial shipment of the competitive product to Alpo and called Leyh, confronting him with that information. Leyh acknowledged that he had manufactured a competing product that might be used to replace 24-M.
 
 
 25
 Leyh testified that Latta's comments in September 1989 that the relationship with Ingredient Specialties should come to an end precipitated his actual sending of the product to Alpo in December 1989. Leyh testified that he continued testing his new formula with Alpo throughout 1990. At the same time, he continued to supply Alpo with 24-M, the Bioproducts' product Alpo was currently using.
 
 
 26
 Throughout the middle months of 1990, Latta testified that he tried to develop a plan of termination satisfactory to both parties. None of Bioproducts' offers, including a separation allowance of up to $90,000 over three years and an agreement not to compete at existing accounts, were acceptable to Leyh.[10] Leyh suggested changes which were not acceptable to Bioproducts. On August 16, 1990, Bioproducts wrote a letter to Leyh informing him that Bioproducts was going to begin billing Alpo directly for its products.
 
 
 27
 We have both tried, in good faith, to find a way to end our relationship in as friendly a manner as possible. However, it appears that this is not going to be possible.
 
 
 28
 Effective September 1, 1990 we will sell and bill, on a direct basis, all accounts where you have acted as a third party to sell our products. We will pay you $.01 per pound on all sales to these accounts for the period September 1, 1990 through December 31, 1990.
 
 
 29
 If you wish to support Bioproducts, Inc. by not interfering in our sales efforts at these accounts, including not selling competing products, we will compensate you at $.005 per pound from January 1, 1991 through December 31, 1992.[11]
 
 
 30
 Bioproducts thereby effectively eliminated Ingredient Specialties as its agent. When Ingredient Specialties received the letter, it had not made payments to Bioproducts for the June, July, or August shipments to Alpo. Ingredient Specialties had received payment from Alpo, however. Ingredient Specialties made the decision to withhold the money owed to Bioproducts for the months of June through September because Bioproducts had, in its view, summarily terminated the agency relationship.[12] Bioproducts filed suit to recover the $220,000 withheld by Ingredient Specialties.
 
 
 31
 Bioproducts' suit against Ingredient Specialties also included a claim for breach of contract accompanied by a fraudulent act with respect to each unpaid invoice for items sold to Ingredient Specialties for resale to Alpo. Ingredient Specialties counterclaimed against Bioproducts for wrongful termination. By order of the district court dated February 15, 1991, Bioproducts' motion for summary judgment on the breach of contract action for goods sold and delivered was granted in the amount of $219,452.93. The court denied Bioproducts' motion to enter judgment at that time.
 
 
 32
 The remaining causes of action were tried before a jury on May 4-6, 1992. The jury returned a verdict for Bioproducts on the claim for breach of contract accompanied by a fraudulent act and awarded $10,000 in punitive damages. The jury also returned a verdict in favor of Ingredient Specialties on the counterclaim for wrongful termination, or unconscionable termination of contract,[13] awarding $100,000 in actual damages and $50,000 in punitive damages. Judgment was entered on all the awards on May 14, 1992. On January 7, 1993, the district court granted Bioproducts' motion to amend the judgment by adding pre-judgment interest and denied Bioproducts' motion for judgment notwithstanding the verdict on the wrongful termination claim. Both parties have filed timely notices of appeal.
 
 Summary Judgment
 
 33
 We review the district court's summary judgment decision de novo, applying the same standard as the district court and construing the facts and all reasonable inferences in favor of the non-moving party, Ingredient Specialties. Helm v. Western M. R. Co., 838 F.2d 729, 734 (4th Cir.1988). Summary judgment should be granted only if there is no genuine issue as to any material fact. Id.; Fed.R.Civ.P. 56(c).
 
 
 34
 Ingredient Specialties has argued that the district court erred in granting summary judgment for Bioproducts on the goods sold and delivered claim because that claim was accompanied by non-frivolous counterclaims. Ingredient Specialties has contended that the invoices that formed the basis for the goods sold and delivered claim were but one component of the multi-faceted relationship between Bioproducts and Ingredient Specialties and that those invoices should not have been viewed as a claim separate and apart from the balance of the relationship for purposes of summary judgment. In addition, Ingredient Specialties has asserted that genuine issues of material fact existed regarding the tortious interference with contractual relations, fraud, and breaches of the covenant of good faith and fair dealing claims which precluded an award of summary judgment.
 
 
 35
 The facts surrounding Bioproducts' recovery on the breach of contract claim are not in dispute. The record establishes that Ingredient Specialties contracted for the sale of product to Alpo. Bioproducts supplied the product to Alpo, and Alpo paid Ingredient Specialties. Leyh withheld four months of payments because Bioproducts terminated the relationship. It is indisputable, then, that Ingredient Specialties owes Bioproducts the amount due on the invoices representing the sales to Alpo as a matter of law. The validity of Bioproducts' termination of Leyh's services is not relevant to the disposition of the breach of contract claim. The judgment in Bioproducts' favor on that issue did not preclude a discrete resolution of the wrongful termination claim.[14] The district court's grant of summary judgment in favor of Bioproducts is therefore affirmed.
 
 Prejudgment Interest
 
 36
 Ingredient Specialties has attempted to argue that Bioproducts' motion for prejudgment interest on May 22, 1992 was untimely in that the district court granted summary judgment in favor of Bioproducts on the breach of contract claim on February 15, 1991. The district court refused to enter judgment in favor of Bioproducts on that summary judgment order until May 14, 1992, however, after the trial of the remaining issues before a jury. At that point, when judgment was entered, Bioproducts acquired the right, under Rule 52(b) to move for an amendment of the judgment. Rule 36 provides that "[t]he notation of a judgment in the docket constitutes entry of judgment." Bioproducts' motion requesting prejudgment interest was timely filed within ten days of the entry of that judgment. Hence, Bioproducts' motion of May 22, 1993 was timely, and Ingredient Specialties' assertions to the contrary are without merit.
 
 
 37
 Bioproducts was not under any obligation to claim entitlement to prejudgment interest in its complaint. Ingredient Specialties has cited Bennettsville v. Bledsoe, 226 S.C. 214, 84 S.E.2d 554, 556 (1954), to the contrary. However, a procedural matter is governed by the federal rules:
 
 
 38
 [W]hile the substantive questions of entitlement to interest and the rates of interest are to be resolved by the applicable state law, the adequacy of a plaintiff's pleadings must be resolved by reference to Fed.R.Civ.P. 54(c) and cases construing it.... These decisions have held that "in diversity cases, it is not necessary for the plaintiff's pleadings to contain a prayer or other request for pre-judgment interest."
 
 
 39
 Consolidated Cigar Co. v. Texas Commerce Bank, 749 F.2d 1169, 1174 (5th Cir.1985). Under the federal rules, therefore, there was no requirement for a specific pleading for prejudgment interest.
 
 
 40
 Ingredient Specialties has also argued that it would be manifestly unfair to allow Bioproducts an award of prejudgment interest because the jury was not apprised of such an award. Had the jury known of the additional interest payments Ingredient Specialties would be required to make, Ingredient Specialties has contended the jury may well have awarded Ingredient Specialties more money on its wrongful termination claim. The argument is moot in light of the fact that Ingredient Specialties has established no such claim.
 
 Wrongful Termination
 
 41
 Turning to Ingredient Specialties' counterclaim regarding the unconscionable termination of the agency relationship, Bioproducts has argued that the relationship between it and Ingredient Specialties was one that was terminable at will without cause and without notice. Ingredient Specialties has disagreed. The district court refused to rule that the relationship was terminable at will relying on evidence submitted by Ingredient Specialties detailing the extent of Leyh's relationship with Bioproducts and the nature of services he provided to Bioproducts over the ten year period. The district court believed that there was an issue of fact as to whether the relationship went beyond the usual at will sales agreement, constituting the extra consideration that makes the existence of reasonable notice a jury issue.
 
 
 42
 In Burger Brewing Co. v. Summer, 261 F.2d 261, 262 (4th Cir.1958), we held that Burger Brewing and Summer were parties to an oral arrangement to distribute beer that constituted a contract of agency which was cancelable by Burger Brewing without previous notice. We characterized the contract of agency as "an agency implicitly abrogable by either party at will without notice" regardless of its denomination as a sales agency, an employment agreement, or a distributorship. Id.
 
 
 43
 It is doctrine in South Carolina that an agency of no fixed duration may be ended by the principal at any time, without cause and without previous notice unless the agent has devoted to the achievement of the aims of the agency a substantial consideration beyond his services. Otherwise, in the latter circumstances the agent might suffer the loss of a consideration obviously invested on the assumption, plainly warranted, of the agency's continuance for such time as would presumably repay the outlay. But this reason does not obtain when the contribution of the agent is nothing appreciably above his services. Burger Brewing, 261 F.2d at 262 (emphasis added). One aspect of the dispute between the parties centers around the extent and nature of Leyh's services. Bioproducts has contended that there is nothing in the record to establish that Ingredient Specialties devoted anything to its relationship with the new owner appreciably beyond personal services. The Burger Brewing court also emphasized that Summer had enjoyed "comparative freedom from expense, financial investment and risk of loss ... as the attribute of an agent for services only." Id. at 263. Bioproducts has suggested that Ingredient Specialties has enjoyed similar advantages while acting as Bioproducts' agent. Leyh's primary outlay of expenses occurred at the beginning of the ten year relationship.
 
 
 44
 Ingredient Specialties has relied primarily on Jack's Cookie Co. v. Brooks, 227 F.2d 935 (4th Cir.1955), appeal after remand, 238 F.2d 69 (4th Cir.1956), cert. denied, 351 U.S. 908 (1956), to counter Bioproducts' argument. In that case we held that the plaintiff's breach of contract claim against Jack's Cookie should not have been dismissed on the ground that the representation was terminable at will. Rather, the case should have been submitted to the jury because the evidence "indicated something more than a contract in which the agent is appointed merely to sell the goods of a manufacturer on commission, and [in which] there is no promise on either side to continue the relationship for a definite period." Id. at 938.
 
 
 45
 On the other hand, if the manufacturer appoints an agent not merely to sell the goods, but the agent in addition to making sales furnishes additional consideration, as when he sets up a distributive system for the manufacturer's goods and his compensation is measured by the amount of goods sold in the territory assigned to him, the manufacturer is not at liberty to terminate the agreement at will even though it contains no provision for its termination, but must retain the agent in the employment for a reasonable period of time.
 
 
 46
 Jack's Cookie, 227 F.2d at 938.[15] Attempting to rely on Jack's Cookie, Ingredient Specialties has claimed that it furnished consideration additional to that provided by the typical jobber or distributor. For example, it provided Bioproducts with Peptone, an ingredient of the successful 24-M formula created for Alpo by Zorich and Leyh in 1985.[16] Ingredient Specialties has also contended that Leyh's exclusive sale of Peptone to Bioproducts constituted additional consideration precluding termination without notice. The record shows, however, that Leyh purchased peptone from SPL and resold it to Bioproducts for a profit. Ingredient Specialties had an informal agreement with SPL under which SPL sold peptone through Ingredient Specialties. Leyh also tried to develop Alpo, ADM/Gooch Feed Mills, Freeborn Foods, and Merrick Foods as peptone customers. Howard Teeter, an employee of SPL, stated in his deposition that SPL had shipped samples to companies other than Bioproducts through Leyh.[17]
 
 
 47
 Ingredient Specialties' role approximated that of the typical distributor both under the old management and after the acquisition. In late 1984, when Trio Management changed the method by which Leyh was compensated for his services, Corkill specifically refused to provide additional compensation for technical services. Leyh continued to work with Bioproducts on the terms offered by Trio Management.
 
 
 48
 Leyh offered Bioproducts a wide range of services. On the other hand, Bioproducts rejected a number of those services, and, in any event, all the services were personal services typical of an agency relationship. Thus, unlike the Jack's Cookie scenario, the evidence in the instant case does not indicate anything more than a contract in which Leyh was retained to sell Bioproducts' goods. In addition, there was no promise on either side to continue the relationship for a definite period.
 
 
 49
 The emphasis on the "personal" nature of the services is more pronounced in Burger Brewing than in Jack's Cookie. Jack's Cookie, the earlier case on which Burger Brewing relied, seems to require only a scope of responsibilities beyond that of the typical distributor to necessitate reasonable notice. Allied and Melchiorre emphasize other aspects of the relationship such as exclusive contracts, extensive dealerships, and expenditures. Our cases read as a whole indicate that an agent does "more" than a typical agent when that agent commits resources, money, and all of his or her time to a certain manufacturer. The agent who provides such extras should not be cut off summarily.
 
 
 50
 Rather, that agent should be given the opportunity to recover for expenditures made in reliance on an agreement in an action for recoupment. In addition, that agent needs notice in order to have the time to develop other sources for goods or other clients in light of the exclusive nature of the terminated contract. From the evidence in the record, Leyh simply does not fit the mold of the agent contemplated in our earlier cases. Ingredient Specialties, all things considered, was simply an at-will agent.
 
 
 51
 Bioproducts has shown through testimony at trial that Leyh's primary outlay of expenses occurred at the beginning of his ten year relationship with Bioproducts. Once the customers had been established, the maintenance was considerably less expensive. The relationship with Bioproducts was not exclusive. And, despite the range of services Leyh provided to Bioproducts, he has not demonstrated that he provided other than personal services to Bioproducts. Even his personal services diminished in scope as the years progressed, particularly after the acquisition. Under pertinent authority, the agreement between Bioproducts and Ingredient Specialties was a contract of agency terminable at will without notice.
 
 
 52
 Further, in view of Bioproducts' efforts to resolve the situation on mutually acceptable terms, the result is fair and reasonable. Bioproducts gave Ingredient Specialties notice that the relationship was going to end as early as September 1989. Leyh testified that he perceived his conversation with Latta at the Pet Food Industries Convention in September 1989 as notice that the relationship between Ingredient Specialties and Bioproducts was coming to an end. Bioproducts also tried to negotiate a mutually satisfactory termination with Leyh after it learned of Leyh's competing product in December 1989. Bioproducts has claimed that its eventual termination of the relationship was justifiable in light of the deteriorating relationship. Although the manner of termination seems to have been plagued by mutual misunderstandings regarding the intents and purposes of the parties, Bioproducts did offer to compensate Ingredient Specialties for the termination period. That offer made it clear that, if notice was required to terminate, it was given.
 
 
 53
 Bioproducts offered four months full profit to Leyh when it submitted notice of termination in writing. Three months notice has been construed as reasonable notice in the context of an oral contract lacking an ascertainable term of duration. Alpha Distributing Co. v. Jack Daniel Distillery, Lem Motlow, Prop., Inc., 454 F.2d 442, 449 (9th Cir.1972), appeal after remand, 493 F.2d 1355 (9th Cir.1974), cert. denied, 419 U.S. 842 (1974).[18] Bioproducts has relied on Glaesner v. Beck/Arnley Corp., 790 F.2d 384 (4th Cir.1986), and Richland Wholesale Liquors v. Glenmore Distilleries Co., 818 F.2d 312 (4th Cir.1987), as cases that cannot be meaningfully distinguished. Glaesner involved an action by a local distributor against a national supplier of foreign auto parts for wrongful termination. We found that the supplier did not wrongfully terminate the distributorship agreement under applicable South Carolina law. Glaesner, 790 F.2d at 389. A dealer terminated in accordance with the terms of the contract has a cause of action only when the supplier acts arbitrarily or in bad faith. The parties in Glaesner had a written agreement that permitted either party to terminate the agreement at any time, without cause, by giving the other party one month's advance written notice. The supplier abided by the terms of the contract and offered to sell to the dealer for an additional ninety days to allow the dealer an opportunity to find new suppliers.
 
 
 54
 Richland Wholesale Liquors, a case decided under the South Carolina Unfair Trade Practices Act, presents a more analogous set of facts. Richland had been Glenmore's exclusive wholesale distributor in South Carolina from 1935 until 1983 when Glenmore terminated the relationship. The parties did not have a written agreement, and it was understood that either party could terminate the relationship at any time for any reason. In February 1983, Glenmore decided to transfer its product line from Richland to McKesson, effective April 1, 1983, based on a number of legitimate business factors. Glenmore communicated that decision to Richland on February 14, 1983, one month and a half prior to the termination date. Following the transfer, Glenmore repurchased its inventory from Richland.
 
 
 55
 We reversed the district court's judgment which was based on a jury verdict in favor of Richland. Glenmore's termination decision was supported by a reasonable business justification and was carried out in a manner which was not contrary to equity or good conscience. "Courts applying South Carolina law have found wrongful termination only in extraordinary circumstances." Richland, 818 F.2d at 315. We cited Glaesner for the principle that
 
 
 56
 a termination is not wrongful if it is in accord with the parties' contract and the manner of termination is not contrary to equity and good conscience .... disputed testimony about motivation does not present a jury question unless there is evidence of supplier behavior which is arguably arbitrary or malicious.
 
 
 57
 Id. The parties in Richland were not operating pursuant to a written contract, yet it was held to be governed by the same principles that were held applicable in Glaesner. Under Richland, the contractual relationship between Ingredient Specialties and Bioproducts was one terminable at will. The record is devoid of evidence that would support a finding that Bioproducts' motivations were arbitrary or malicious.[19] Both Leyh and Latta testified to notice in September 1989 and December 1989. Bioproducts gave notice that it was terminating the relationship in August 1990 but planned to continue giving Ingredient Specialties full profits for four more months. Bioproducts also offered to continue paying Ingredient Specialties half of all commissions it would have earned over the following two years if it agreed not to compete. To sum it all up, the agency was at will, and Ingredient Specialties failed to establish arbitrary or malicious motivations. The district court erred as a matter of law by submitting the unconscionable termination claim to the jury. Alternatively, the district court could have ruled that the notice and manner of termination were reasonable.
 
 CONCLUSION
 
 58
 The district court's summary judgment award in favor of Bioproducts and the award of prejudgment interest is affirmed. Likewise, the jury verdict in favor of Bioproducts on the fraud claim is affirmed. The jury verdict in favor of Ingredient Specialties on the wrongful termination claim is reversed in light of the district court's error of law in refusing to find that the agency was terminable at will without notice or, alternatively that, as a matter of law, the notice given was reasonable.
 
 The judgment, accordingly, is
 
 59
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 Bioproducts is a Delaware corporation with its principal place of business in Ohio. Bioproducts is currently a wholly-owned subsidiary of Mitsui, a Japanese trading company. Ingredient Specialties is a Michigan corporation with its principal place of business in South Carolina. The United States District Court for the District of South Carolina exercised jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. Sec. 1332. The amount in controversy exceeded $50,000
 
 
 [2]
 Leyh described his relationship with Bioproducts as one including the following responsibilities on the part of Ingredient Specialties: identification of markets; development of product needs within the market; culturing of accounts; devising market strategies; providing computer generated data; developing customer strategies and marketing plans; conducting marketing surveys; and making sales calls. In addition, Leyh claimed that he undertook new product identification; technical sales and presentations; new product and market opportunities; advertising; and development of a Marketing Information System
 Leyh has provided extensive details in support of his argument that his role was significantly greater than that of an ordinary agent or broker. While his role may have been greater than that of an ordinary broker or agent prior to the acquisition, the new Bioproducts appeared, after the acquisition, to envision a more limited role for Leyh which it began to establish from the outset. Most of the information Leyh has submitted to establish the existence of his extended involvement with Bioproducts dates back to the years prior to the acquisition. In addition, all aspects of Leyh's contribution can be characterized as personal services.
 
 
 [3]
 The acquisition by Nutrius plays an important role in the relationship between Leyh and Bioproducts. For ease of reference, we refer to the years 1980-86 as those prior to "the acquisition" and the later years (1986-90) as after "the acquisition."
 
 
 [4]
 Although Leyh primarily marketed and sold pet food ingredients manufactured by Bioproducts, he also provided Bioproducts with a palatability-enhancer called peptone which he purchased from SPL
 
 
 [5]
 A co-packer is a pet food manufacturer which contracts with another pet food manufacturer (in this case Alpo) to manufacture its products. At the time, Alpo's only plant was in Allentown, Pennsylvania. Co-packing agreements facilitated Alpo's nation-wide distribution
 
 
 [6]
 Barricks testified that the new Bioproducts took both the Quaker and the Ralston-Purina accounts away from Leyh. Barricks said that Leyh introduced Bioproducts to Quaker as early as 1985 and that Bioproducts subsequently lost that account. In January, February or March of 1989, the new management made a presentation to Quaker without advising Ingredient Specialties because, as of January 1987, Bioproducts no longer considered Quaker an Ingredient Specialties account. Barricks also testified that Ralston-Purina was an Ingredient Specialties account when he joined Bioproducts in 1984. In July 1987, the new Bioproducts management hired Dan Gallagher, a former Ralston employee, to head up the research and development. From that point on, Barricks testified, Ralston became Gallagher's account and Leyh was no longer part of it
 
 
 [7]
 Zorich is a former employee of Bioproducts. When the acquisition took place she was working out of her home in Vancouver, Washington. She was directing research and development through her computer and telephone. Although she and other employees were told nothing would change as a result of the new management, "as time went along, visiting with Mr. [Steve] Latta, [her] job description for the title held suddenly changed to the point where [she] could no longer fulfill the requirements of that position. So, [she] chose to leave."
 
 
 [8]
 Zorich also testified that Latta informed her and Barricks that Ralston-Purina was no longer a Leyh account and that she and Barricks began to go to Ralston without Leyh
 
 
 [9]
 Ultimately, Bioflavors proved unsuccessful and never resulted in any sales to Alpo
 
 
 [10]
 Leyh testified that from 1983-1990, Ingredient Specialties' eight year average gross profits were about $95,000 to $100,000 a year
 
 
 [11]
 Both parties interpreted this language as an offer to pay Leyh the entire gross profit on sales of Bioproducts' products to Ingredient Specialties' accounts for four additional months, and one half the entire gross profits for "the next year." In actuality, however, the letter offers to pay Leyh half of the gross profits for the next two years--from January 1, 1991 through December 31, 1992
 
 
 [12]
 In October 1990, Leyh activated a dormant company he had incorporated in Michigan in 1985 called Pet Food Ingredients, Inc. Between November 8, 1990 and January 30, 1992, Leyh generated sales of $1,042,520.54
 
 
 [13]
 Ingredient Specialties characterized the claim as "termination of the contract contrary to equity and good conscience" in the pleadings
 
 
 [14]
 The district court did not enter judgment in favor of Bioproducts on the breach of contract claim until the jury had resolved the remaining issues. The issues of material fact allegedly present in the claims of fraud, tortious interference, and breach of the covenant of good faith and fair dealing were presented to the jury
 
 
 [15]
 Ingredient Specialties has cited Melchiorre v. California Canners and Growers, 394 F.2d 413 (4th Cir.1968), as a case affirming the principles set forth in Jack's Cookie. Although Melchiorre does affirm the broad principles, the facts are dissimilar. In Melchiorre, in the context of a twenty-year, exclusive relationship, we held that "the reciprocal promises of exclusiveness were the quid pro quo of valuable consideration." Id. at 415. We wrote, "[t]he stipulation confining Melchiorre's distribution to Cal-Can's products is also the feature which bars Cal-Can's defense of damnum absque injuria. With this condition imposed, no investment or other preparation for the undertaking was essential to the liability of Cal-Can to Melchiorre." Id. Therefore, the exclusive nature of the contract distinguished the suit from Burger Brewing
 However, Bioproducts did not make a pledge to let Ingredient Specialties service all of its accounts. In fact, the post-acquisition Bioproducts wanted inside employees to attend all meetings with Leyh. Nor did Ingredient Specialties have an exclusive agreement with Bioproducts. Ingredient Specialties attempted to develop other clients for Peptone, purchased product from Scientific Protein Laboratories (SPL), and serviced clients other than Bioproducts. Ingredient Specialties' distribution, unlike Melchiorre's, was not limited to Bioproducts' products.
 Melchiorre distinguished cases such as Burger Brewing on the grounds that such decisions "excused the principal because the agent or franchiser had incurred no expense in order to carry his burden under the agreement. In no instance, however, was there a covenant by the plaintiff to refrain from handling the merchandise of another." Melchiorre, 394 F.2d at 415.
 Similarly, in Allied Equipment Co. v. Weber Engineered Products, Inc., 237 F.2d 879, 880-81 (4th Cir.1956), the distributor had an exclusive contract and a territory, neither of which characterize Ingredient Specialties' position with respect to Bioproducts. Allied established an extensive system of dealerships for Weber and leased a new building at least in part in reliance on Weber's representations.
 
 
 [16]
 Leyh made a profit of approximately $50,000 per year on its sale of Peptone to Bioproducts. Leyh purchased Peptone from the manufacturer, SPL
 
 
 [17]
 Leyh attempted to obtain a formal, written contract with SPL but, according to Teeter's testimony, was unable to do so. SPL did refuse to sell peptone directly to Bioproducts, however, claiming that it sold that product through Leyh
 
 
 [18]
 In Alpha, Jack Daniels terminated a ten year distributorship which had existed pursuant to an oral agreement by giving Alpha three months notice. The Ninth Circuit found three months to be reasonable notice, even though Alpha provided an exclusive distributorship
 
 
 [19]
 " 'While supplier behavior that is arguably arbitrary or malicious would present a question for the jury, South Carolina law has never equated the exercise of reasonable business judgment with an act of tortious bad faith.' " Richland, 818 F.2d at 316 (citing Glaesner, 790 F.2d at 390)