PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WMTC, INCORPORATED, d/b/a
Martint Laundry Systems of
Gaffney, South Carolina,

*Plaintiff-Appellee,*

v.

G. A. BRAUN, INCORPORATED,

*Defendant-Appellant.*

No. 00-1499

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr., District Judge.
(CA-99-365-6-13)

Argued: January 25, 2001

Decided: April 13, 2001

Before WILKINSON, Chief Judge, WILKINS, Circuit Judge,
and James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Wilkins and Senior Judge Michael
joined.

---

## COUNSEL

**ARGUED:** Alan J. Pierce, HANCOCK & ESTABROOK, L.L.P.,
Syracuse, New York, for Appellant. Robert Wilkinson Hassold, Jr.,

NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Greenville, South Carolina, for Appellee. **ON BRIEF:** Clinch H. Belser, Jr., Michael J. Polk, BELSER & POLK, P.A., Columbia, South Carolina, for Appellant.

## OPINION

WILKINSON, Chief Judge:

WMTC, Inc. sued G.A. Braun, Inc. for wrongful termination of a distributor agreement. The jury returned a verdict in favor of WMTC. Braun then filed a motion for judgment as a matter of law claiming, *inter alia*, that there was insufficient evidence to support the verdict. The district court denied this motion. Because Braun's decision to terminate WMTC involved an exercise of business judgment and was not arbitrary or malicious, the judgment of the district court is reversed and remanded for entry of judgment in favor of the defendant manufacturer.

## I.

G.A. Braun manufactures textile and laundry equipment. Dick Rhyne's company, WMTC, Inc., was the exclusive distributor of Braun's laundry equipment for South Carolina, Georgia, North Carolina, Tennessee and Alabama. WMTC's distributorship agreement was established through oral communications with Braun and through performance by WMTC.

In mid-1997, Braun's upper management changed. The new management decided to issue annual minimum quotas to its distributors. Distributors who failed to meet their minimum quota risked having their distributor agreements canceled. WMTC's 1997 minimum quota was $830,000. WMTC's actual 1997 sales for its five state area was $666,889 — $163,111 short of the minimum.[1] On December 29,

---

[1] WMTC's total sales for 1997 were $799,998.37. Of this total, $133,109.37 involved transactions in Mexico and thus was not credited by Braun toward WMTC's minimum quota for its five states.

1997, Braun informed WMTC that it had to achieve $750,000 in sales in the first quarter of 1998 in order to remain a Braun distributor. On February 10, 1998, Braun told WMTC that its minimum quota for all of 1998 would be $2,000,000. This quota was based on the population growth in WMTC's area and was $735,000 higher than the quota for any of Braun's other large distributors. Also in February 1998, Braun hired John Cox to be regional sales manager for WMTC's five state area.

On June 11, 1998, Braun terminated WMTC as an authorized Braun distributor. In the termination letter, Braun explained that WMTC had "failed to meet the first-quarter requirements" and it "is readily apparent that the laundry group is not in a position to meet this year's target quotas." As a result, Braun stated that it had "lost confidence in the laundry group to meet its target quotas." Braun subsequently assigned WMTC's territory to John Cox.

WMTC filed suit, alleging that it had an implied contract with Braun and that Braun wrongfully terminated this agreement. The jury returned a verdict against Braun in the sum of $800,000. Braun then filed a Rule 50(b) motion, arguing, *inter alia*, that it was entitled to judgment as a matter of law. The district court denied Braun's motion. Braun appeals.[2]

## II.

For purposes of this appeal we shall assume without deciding that Braun and WMTC had an implied distributorship agreement. However, since the underlying contract was a product of the conduct of the parties rather than a written instrument, it did not provide for a termination date. Under South Carolina law, contracts which "express no

---

[2]WMTC claims that Braun's motion before the district court did not request judgment as a matter of law on the issue of wrongful termination. This is not so. Braun's motion specifically argued that there "was insufficient evidence as a matter of law to support a finding that there was a wrongful termination of any contract between Braun and the plaintiff." Moreover, the district court's opinion discussed this issue at length. Thus it cannot be said that Braun failed to preserve its right to appeal the issue of wrongful termination.

period for [their] duration," may be terminated by either party "on giving reasonable notice of his intention to the other." *Carolina Cable Network v. Alert Cable TV, Inc.*, 447 S.E.2d 199, 201 (S.C. 1994) (quoting *Childs v. City of Columbia*, 70 S.E. 296, 298 (S.C. 1911)).

The right of one party to terminate a contract of indefinite duration is subject only to the mildest restraint. *See Philadelphia Storage Battery Co. v. Mutual Tire Stores*, 159 S.E. 825 (S.C. 1931). In applying the South Carolina precedents, we have held that a cause of action for wrongful termination exists "only in extraordinary circumstances" such as when one party has "acted maliciously and without reasonable business justification in ending the relationship." *Richland Wholesale Liquors v. Glenmore Distilleries Co.*, 818 F.2d 312, 315-16 (4th Cir. 1987). *See also Glaesner v. Beck/Arnley Corp.*, 790 F.2d 384, 389 (4th Cir. 1986) (finding no wrongful termination where there was no evidence that Beck/Arnley acted "maliciously" and where there were "easily comprehensible business reasons for terminating" the contract).

WMTC claims that Braun acted in bad faith and that the decision to terminate the distributorship agreement was not a reasonable business judgment. According to WMTC, Braun exhibited bad faith by establishing unattainable quotas for WMTC that were much larger than those assigned to distributors with larger populations. Moreover, WMTC claims that Braun's termination was based on WMTC's failure to meet the first quarter quota of $750,000 in sales even though that requirement had been superceded by the $2,000,000 annual quota. According to WMTC, Braun manufactured a reason to terminate its contract with WMTC so that it could reassign WMTC's territory to its own employee, John Cox. WMTC believes that this was part of Braun's nationwide plan to bring its sales in-house.

Braun responds by arguing that WMTC's sales staff was serving multiple masters and focusing its time on products other than Braun laundry and finishing equipment. Braun also claims that WMTC's "sales figures for 1997 were unacceptable and did not represent what they should be based on the total population in the area, the migration of population into the five states, and the extensive vacation and tourism trade, all of which should correspond into the sales of commercial and industrial laundry equipment." Moreover, Braun points out that

WMTC's per capita performance ranked in the bottom half of all its distributors. And Braun claims it knew in June 1998 that WMTC would not meet its 1998 minimum quota because of the significant "lead times" associated with the sale of laundry equipment.

This whole exchange at trial, however, completely misses the legal mark. Even accepting all of WMTC's arguments as true, it has still failed to make out a claim of wrongful termination. In *Richland*, for example, the plaintiff claimed wrongful termination because the defendant "had a secret agreement" to transfer the distributorship to another party and thus "required Richland to meet outrageous performance goals in order to manufacture a business justification for the termination." 818 F.2d at 316. We rejected the claim in that case because the defendant had "acted in accordance with its undisputed right to terminate the relationship" and because flagging sales provided "a legitimate business justification for transferring the distributorship" to another party. *Id.* Moreover, we found that even if there had been a prior secret agreement to transfer the distributorship, this would not undermine the legitimacy of the termination decision. Rather, a wrongful termination claim requires evidence of "malicious or arbitrary conduct in bringing about the termination." *Id.* at 317.

WMTC's wrongful termination claim fails for the same reasons. Unless otherwise forbidden by statute or contract, a manufacturer is entitled to set quotas for the sales of its product. Indeed, brisk sales are the lifeline of a business enterprise. Without a written contract to the contrary, a distributor assumes the risk that the sales requirements imposed on it will fluctuate. Moreover, Braun terminated WMTC only after it failed to meet the 1997 minimum quota, failed to meet the 1998 first-quarter quota, and after it came to the conclusion that WMTC would fail to meet the 1998 annual quota. Indeed, Braun was explicit in its reasoning, stating that it had "lost confidence in the laundry group to meet" its minimum quotas. The fact that reasonable business managers may dispute the relative stringency of a sales quota does not transform a judgment on marketplace conditions into a jury question. Given that WMTC had repeatedly failed to meet its quotas, Braun "was not obliged by statute, by common law, or by contract to stand mute in the face of such a development." *Glaesner*, 790 F.2d at 390.

Even if Braun had some larger plan to bring its sales in-house, this would not undermine the legitimacy of its business decision to terminate WMTC's distributorship. Businesses are free to arrange their sales forces as they see fit. The decision whether to use an independent contractor, a distributor, or an in-house sales force or whether to abandon one in favor of another does not amount to the sort of "extraordinary circumstances" that justifies sending a wrongful termination claim to a jury. *See Glaesner*, 790 F.2d at 389.

A manufacturer has every incentive to maintain its relationship with a successful distributor of its product. Indeed, Braun tried to make a success of WMTC. Ample uncontradicted evidence establishes that Braun tried to help WMTC reach its minimum quotas. For example, Braun sent WMTC a copy of its Performance Plan in order to assist WMTC in making sales. Braun also informed WMTC of "laundry networks" in its region that could be tapped to make additional sales. And Braun organized sales meetings that Rhyne himself described as a "success" and "most professionally organized." Rhyne even conceded at trial that "[w]hen we asked for assistance [from Braun], we normally got it." It is difficult for WMTC to maintain a claim for malicious termination in the face of such efforts to assist it.

### III.

Were we to recognize the claim here, the normal conduct of commercial relations would be transformed by the law of torts with all of its attendant unpredictability. We do not believe that South Carolina law countenances such a result. For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for entry of judgment in favor of the defendant, G.A. Braun, Inc.

*REVERSED AND REMANDED*